Commonwealth *v.* Patterson et al., Appellants.

Argued May 4, 1973. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, POMEROY and MANDERINO, JJ.

*Frank Patterson,* appellant, in propria persona, and *Samuel W. Salus, II,* Public Defender; *Kenneth W. Owens, Jr.,* appellant, in propria persona, and *Harry L. Green,* First Assistant Public Defender; *David Bridell,* appellant, in propria persona, and *David B. Fitzgerald,* Assistant Public Defender, for appellants.

*J. David Bean,* Assistant District Attorney, with him *Stewart J. Greenleaf,* Assistant District Attorney, *William T. Nicholas,* First Assistant District Attorney, and *Milton O. Moss,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE ROBERTS, July 2, 1973:

Appellants—David Bridell, Kenneth Owens, and Frank Patterson—were found guilty of direct criminal contempt in a summary proceeding before Judge HONEY-MAN of the Common Pleas Court of Montgomery County. Each appellant was sentenced to six months imprisonment to be served consecutively with sentences presently being served. Appellants' motions for a new trial on the contempt charges were denied. We allowed leave to appeal, as though timely filed, and now affirm.

On February 15, 1972, appellants were scheduled for trial before Judge HONEYMAN on charges of riot and assault by a prisoner. At that time, after extensive examination by the court, appellants were permitted to dismiss their appointed counsel. Appellant Owens, who was permitted to proceed pro se, was also selected by the other appellants to represent them. See ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §6.6 (Approved Draft, 1972).

On the following day, Owens repeatedly asked the judge personal questions and moved to have the judge disqualify himself. The court denied these motions as well as appellants' challenges to the composition of the jury panel. After accusing the court of bias, appellants announced their intention to leave the courtroom. The record reveals the following colloquy and subsequent disruption: "THE COURT: All right. Let the record note that questionnaires from the prospective jurors have been made available to the defendants. Now, Mr. Oehrle [prosecutor], do you want to address the prospective panel? MR. OEHRLE: Yes, sir. Thank you. MR. OWENS: Again, your Honor, now, I am going to tell you something and I think you better listen to what I am going to tell you. I'm not going to tell you again. You can take that any way you want. Now, we have stated that we are not going to— THE COURT: Will you stand up, please, when you address the court? MR. OWENS: We have stated that we are not going to proceed with your form of justice.

"Now, I am not going to tell you that again. Now, I don't know what it will require for you to understand this fully but understand well that until such time as you have like individuals who represent our particular social and economic group, Blacks, per se, you're not going to conduct this. Now, if this requires whatever you want, you will have all that, plus. THE COURT: Mr. Oehrle, you may address the prospective panel of jurors. MR. OWENS: Let's leave. This is not— THE COURT: I will direct the court attendants to have the defendants remain in the courtroom. MR. OWENS: No, you're not going to direct— THE COURT: Remain in the courtroom, please. MR. BRIDELL: Take your hands off me— (Fight erupts in courtroom at 10:45 A.M.) (Defendants subdued.) 11:08 A.M. THE COURT: This is out of the hearing of the jury panel. I have directed the defendants to

be brought before the court one at a time, and the defendant, David William Joseph Bridell, is before the court. I want the court reporter to read what he reported as the events happened until there was a disruption in the courtroom. (At this point the reporter read back the [above] portion from his notes of testimony.) . . . Judge HONEYMAN then stated on the record: THE COURT: Now, I will describe what I observed at that juncture. The defendants, in defiance of an order of direction of the court, sought to leave the courtroom. The court attendants and the deputy sheriffs, in an effort to enforce the order of the court, met with violence on the part of the defendants. Directly in front of the bench and the desk of the court reporter, one of the defendants was subdued. I observed that the defendants punched the deputy sheriffs. There are bloodstains on the carpeting of the courtroom immediately before the bench of the court. One of the defendants was subdued over the counsel table. I observed one of the defendants, after he was handcuffed, kick out at the groin of one of the deputy sheriffs. It took at least eight or nine deputy sheriffs to subdue and calm down and properly restrain the defendants, and they were removed from the courtroom. By reason of the obvious security problems based upon those developments, I directed that the defendants be brought back before the court one at a time to show cause why they should not be adjudged in contempt of this court."

Immediately following the disruption, each appellant, individually, was brought before the judge and given an opportunity to address the court.[1] The judge found each appellant in contempt of court "by reason of what is on the record, what has transpired in this

---

[1] Appellant Bridell advised the court that, "So far as that contempt, you know, you can take it, package it into a shoe box, and shove it up where you defecate at."

courtroom," and sentenced each to six months imprisonment.[2]

It is clear that appellants' conduct constituted direct criminal contempt. In *Knaus v. Knaus*, 387 Pa. 370, 375, 127 A. 2d 669, 671 (1956), we said: "A direct criminal contempt consists of misconduct of a person in the presence of the court, or so near thereto to interfere with its immediate business, and punishment for such contempts may be inflicted summarily: Act of June 16, 1836, P. L. 784, §§23, 24, 17 P.S. §§2041, 2042; Levine Contempt Case, 372 Pa. 612, 95 A. 2d 222; Snyder's Case, 301 Pa. 276, 152 A. 33." See also *Commonwealth v. Snyder*, 443 Pa. 433, 275 A. 2d 312 (1971). Here, appellants' courtroom misconduct—not only refusing to accede to the court's order to remain in the courtroom, but also engaging in a fight with the court attendants—occurred in the presence of the court.

Appellants do not seem to challenge the fact that their disruptive conduct constituted direct criminal contempt. Rather, relying on *Mayberry v. Pennsylvania*, 400 U.S. 455, 91 S. Ct. 499 (1971), they assert that they are entitled to a public trial before another judge on the contempt charges. In *Mayberry*, the United States Supreme Court held that, where a judge "becomes embroiled in a running, bitter controversy" and does not act until the end of the trial, "by reason of the Due Process Clause of the Fourteenth Amendment a defendant in criminal contempt proceedings should be given a public trial before a judge other than the one reviled by the contemnor." Id. at 465, 466, 91 S. Ct. at 505.

The factors relied upon by the Supreme Court in *Mayberry* are not present in this case. The trial court,

---

[2] Judge HONEYMAN continued the trial of riot and assault by a prisoner charges to a subsequent term and disqualified himself from that case.

here, was not "embroiled in a running, bitter controversy" with the appellants. The actions of appellants—while certainly contemptuous—were not the type of constant, personal vilification which characterized defendant's actions in *Mayberry.*

Nor did the court, here, wait until the conclusion of the trial to act against the contemnors. As the record reveals, the judge immediately proceeded against each appellant, individually. Such prompt action is approved in *Mayberry*: "He [the trial judge] could, with propriety, have instantly acted, holding petitioner in contempt. . . ." Id. at 463, 91 S. Ct. at 504.

In *Illinois v. Allen,* 397 U.S. 337, 343-44, 90 S. Ct. 1057, 1061 (1970), the United States Supreme Court said: "It is essential to the proper administration of criminal justice that dignity, order, and decorum be the hallmarks of all court proceedings in our country. The flagrant disregard in the courtroom of elementary standards of proper conduct should not and cannot be tolerated. We believe trial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case. No one formula for maintaining the appropriate courtroom atmosphere will be best in all situations. We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant like Allen: (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."

More recently, the United States Court of Appeals for the District of Columbia observed: ". . . a conflict may exist in the case of summary conviction at trial—immediately after the allegedly contemptuous conduct has occurred. In such situations, it is clear that if the trial judge deems summary conviction necessary to preserve order in the courtroom and to protect the author-

ity of the court, summary conviction is proper. And this is presumably true even if the judge has evidenced personal embroilment or has been personally attacked. In such cases, as Justice DOUGLAS made clear in *Mayberry* by suggesting that summary conviction would have been the preferred response of the trial judge in that case, the need to preserve order, by itself, not only supports summary disposition, but also outweighs the possibility of bias on the part of the trial judge." *United States v. Meyer,* 462 F. 2d 827, 843 (D.C. Cir. 1972).

In the circumstances presented by this record, the trial judge's response—to proceed summarily[3] and not recuse himself—was constitutionally permissible. See *In Re Chase,* 468 F. 2d 128 (7th Cir. 1972) ; *People v. Jashunsky,* 51 Ill. 2d 220, 282 N.E. 2d 1 (1972) ; *Commonwealth v. Snyder,* supra. Indeed, the Supreme Court noted in *Mayberry,* supra at 465-66, 91 S. Ct. at 505: "It is, of course, not every attack on a judge that disqualifies him from sitting. In Ungar v. Sarafite, 376 U.S. 575, 84 S. Ct. 841, 11 L. Ed. 2d 921, we ruled that a lawyer's challenge, though 'disruptive, recalcitrant and disagreeable commentary', was still not 'an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification'. Id. at 584, 84 S. Ct. at 847."[4]

---

[3] Since appellants were found guilty of a "petty" offense and were sentenced to only six months imprisonment, a jury trial is not constitutionally required. See *Baldwin v. New York,* 399 U.S. 66, 90 S. Ct. 1886 (1970) ; *Bloom v. Illinois,* 391 U.S. 194, 88 S. Ct. 1477 (1968).

[4] The ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §7.5 (Approved Draft, 1972) provide: "The judge before whom courtroom misconduct occurs may impose appropriate sanctions, including punishment for contempt, but should refer the matter to another judge if his conduct was so integrated with the contempt that he contributed to it or was otherwise involved, or his objectivity can reasonably be questioned."

Our determination is fully in accord with *Mayberry* and *Allen,* and in complete harmony with the ABA Standards for Criminal Justice. Those Standards state in pertinent part: "The court has the inherent power to punish any contempt in order to protect the rights of the defendant and the interests of the public by assuring that the administration of criminal justice shall not be thwarted. The trial judge has the power to cite and, if necessary, punish summarily anyone who, in his presence in open court, willfully obstructs the course of criminal proceedings." ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §7.1 (Approved Draft, 1972).[5] Here, the trial court properly exercised its power to "punish any contempt" in order to assure that the "administration of criminal justice shall not be thwarted."

It is universally accepted that the trial judge has the responsibility and authority to maintain in the courtroom the appropriate atmosphere for the fair and orderly disposition of the issues presented. In the judge is vested the power and authority to maintain the order and integrity of the judicial process. Manifestly, "[t]he only purpose of a criminal trial is to determine whether the prosecution has established the guilt of the accused as required by law, and the trial judge should not allow the proceedings to be used for any other purpose." ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §1.1 (Approved Draft, 1972).

It is obvious that the trial judge's function is best performed and the interests of the proper administra-

---

[5] The Standards additionally provide that the court's power to punish any contempt may be exercised against defendants who are representing themselves. ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §6.9 (Approved Draft, 1972) and commentary thereto.

tion of criminal justice are best served when "judicial powers are used impartially in a firm and dignified manner." ABA Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge §1.1, Commentary at 27 (Approved Draft, 1972).

This is precisely the manner in which Judge HONEYMAN performed his judicial responsibilities.

Judgments of sentence affirmed.

Mr. Chief Justice JONES concurs in the result.

Mr. Justice NIX took no part in the consideration or decision of this case.

---

DISSENTING OPINION BY MR. JUSTICE MANDERINO:

I must respectfully dissent.

Contempt of court is a *crime.*

In all criminal prosecutions, a person is entitled to his constitutional rights. The judicial branch of government cannot ignore the constitutional rights of citizens when the *crime* is contempt of court rather than any other crime.

Due process of law prohibits the conviction of any person before a tribunal in which one person serves as prosecutor, defense counsel, witness, judge, and jury. Due process requires an objective neutral tribunal. If a policeman were allegedly kicked by a person obstructing justice, we might call it *contempt of the policeman.* It would be constitutionally impermissible, however, to allow the policeman to conduct an on-the-spot-one-man-trial and impose punishment. If the President of the United States were obstructed in the performance of his executive functions, we would call it *contempt of the President,* but it would be unconstitutional to allow him to mete out punishment by snapping his fingers. If a member of the House of Representatives were obstructed in the performance of his legislative function,

we could call it contempt of the legislature, but we could not constitutionally allow a quick thumbs-up or thumbs-down decision for the imposition of punishment.

Why should we allow a judge (or Justice) to have a special privilege when the judicial function is allegedly obstructed? There is constitutional silence concerning any special judicial privilege which permits the judicial branch to deprive a person of constitutional rights because a member of the judicial branch is involved. Punishment for contempt of court without constitutional protections *that exist for all other crimes* is nothing more than the exercise of raw judicial power. It is not the exercise of constitutional judicial authority.

Would we permit a person who is a witness to a crime to file a complaint, take the witness stand at the trial, receive immunity from cross-examination, get off the witness stand and jump into the judge's chair, make a final decision and impose punishment? Constitutional law prohibits such a practice. It does so for judges as well as all other citizens.

The special judicial privilege of punishing a person for the *crime* called *contempt of court* developed in Star Chamber proceedings in the early 1600's. An extreme use of the special privilege occurred in 1631, when a convicted felon hurled a brickbat at the Chief Justice, missed, and was summarily dispatched by severing his right hand and nailing it to the gibbet before hanging him in the presence of the court. Patterson, A Proposal for Reform Providing "The Least Possible Power Adequate to the End Proposed," 17 S.D.L. Rev. 41 (Winter, 1972).

We do not today summarily cut off hands and hang in the presence of the court but we should root out and eliminate completely every vestige of this privileged practice. *The obstruction of justice,* in any way, at any time, by any person, *is a serious offense.* We have, how-

ever, other workable procedures to prevent disruptions in the courtroom. We do not need a special privilege for judges which dispenses with constitutional safeguards.