353 A.2d 855

COMMONWEALTH of Pennsylvania

v.

Africa AFRICA, Appellant.

COMMONWEALTH of Pennsylvania

v.

Merle AUSTIN, Appellant.

COMMONWEALTH of Pennsylvania

v.

Laverne SIMS, Appellant.

COMMONWEALTH of Pennsylvania

v.

Gerald FORD, Appellant.

COMMONWEALTH of Pennsylvania

v.

Theodore WILLIAMSON, Appellant.

COMMONWEALTH of Pennsylvania

v.

Conrad HAMPTON, Appellant.

COMMONWEALTH of Pennsylvania

v.

Donald GROSSMAN, Appellant.

Supreme Court of Pennsylvania.

Argued June 23, 1975.

Decided March 17, 1976.

606

608

Benjamin Lerner, Defender, John W. Packel, Asst. Defender, Chief, Appeals Div., Patrick J. Mandracchia, Douglas H. Riblet, Asst. Public Defenders, Philadelphia, for appellants.

F. Emmett Fitzpatrick, Dist. Atty., Steven H. Goldblatt, Asst. Dist. Atty., Chief, Appeals Div., Glen Gitomer, Asst. Dist. Atty., Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION OF THE COURT

ROBERTS, Justice.

■ We are asked in these appeals to review [1] appellants' summary convictions for contempt of court.

I

Appellants were arrested on charges arising from their participation in a protest demonstration held on October 25, 1974, in Philadelphia. Trial on these charges began on January 15, 1975. At the opening of trial, the court granted appellants' motion that they be permitted to represent themselves, but appointed a public defender to act as their legal adviser. Appellants, alleging that the judge was prejudiced by pretrial publicity and by a statement of the assistant district attorney that two appellants were charged in another case, moved for the judge to disqualify himself. This motion was denied. After some preliminary discussions, appellant Africa Africa was called upon to enter her plea. The following occurred:

"THE COURT CRYER: Africa Africa, on Bill number 2794,

October Term, 1974, charging you with disorderly conduct, failing to disperse at official order and criminal conspiracy, how do you plead?

AFRICA AFRICA: You ask me to make a judgment? Are you asking me to make a judgment now?

THE COURT: You will enter a not guilty plea on behalf of the defendant.

1. We hear this appeal under authority of the Appellate Court Jurisdiction Act of 1970, Act of July 31, 1970, P.L. 673, art. V, § 503(a), 17 P.S. § 211.503(a) (Supp.1975). Appellants urge jurisdiction under section 202(5) of the Act, id., art. II, § 202(5), 17 P.S. § 211.202(5). However, as this criminal contempt arises in a municipal court, and not a court of common pleas, jurisdiction for this appeal does not lie under that section.

AFRICA AFRICA: If you are saying I'm not guilty, you are saying I'm innocent, right?

THE COURT: You may go on.

AFRICA AFRICA: Are you saying I'm innocent?

THE COURT: No, madam.

AFRICA AFRICA: You said I'm not guilty.

THE COURT: That is why we are here today, madam.

AFRICA AFRICA: To do what? To try me, to find out if I'm guilty or innocent?

THE COURT: If you persist in your conversation, I assure you I will take steps.

AFRICA AFRICA: What I'd like to say—I'd like to say one thing to you. I know your reputation. I know you are supposed to be a nasty judge, but I want to know, do you get this reputation because you know what the law is or do you have this reputation because you can give out contempt charges? Because if that's the case, anybody can hold for contempt, a bum on the street can do that."

Appellants then asked that they be permitted to stand mute, which the judge allowed.

Appellants apparently had three theories of defense. They attempted to show: first, that they had been arrested primarily because they had been using profanity over a loudspeaker system at the demonstration; second, that their arrests were based upon the individual judgment of the arresting officers that they were using profane language; and third, that they were victims of selective enforcement of the law by the police department. Because they were unable to articulate either what the defense theories were, or their legal relevance to the charges, their questioning of witnesses was punctuated with "Objection. Objection sustained." Further, as a result of their inexperience in a court of law, and possibly in an effort to use the court as a platform for

their views, their "cross-examination" often became either argument or their own direct testimony. This is illustrated by the cross-examination of the Commonwealth's first witness by appellant Theodore Williamson:

"CROSS–EXAMINATION BY THEODORE WILLIAMSON—

Q. Because I am saying in my reference, bomb, science is profane. War is profane. I don't know what you are talking about.

MR. BUTLER: Objection, that is not a question.

THE COURT: Objection sustained. These are argumentative points.

Q. Officer Patton, do you say a bomb was profane?

MR. BUTLER: Objection.

THE COURT: Objection sustained.

Q. Officer Patton, do you say war is profane?

MR. BUTLER: Objection.

THE COURT: Sustained.

Q. Do you say rape as [sic] profane?

MR. BUTLER: Objection.

THE COURT: Sustained.

Q. Do you see either handcuffing and arresting and jailing innocent people is profane?

MR. BUTLER: Objection.

THE COURT: That too is sustained."

Through several rounds of questioning which followed the pattern above, it is apparent that appellants were becoming increasingly restive. Then the following occurred:

"[Appellant] CONRAD HAMPTON: I would make a motion to the Court. Have it be done on the record.

THE COURT: What is it?

CONRAD HAMPTON: I want to point out the Move Organization have been tried with injustices, so called

breaking the law. This is supposed to be a Court room of justice, a City Hall of justice. Who is going to speak of all the injustices that was poured down on the Move Organization because masochistic sheriffs and police officers beat me, when I was punched, when I was kicked and drug from the Court room, slammed into the elevator, slammed my face against concrete walls. When are these maniacs, these criminals going to be on trial?

THE COURT: Mr. Hampton—

CONRAD HAMPTON: How much longer do you intend to let these criminals go uncharged?

THE COURT: Mr. Hampton, do you have anything further to say?

CONRAD HAMPTON: When I say what I am saying —

THE COURT: You have made your point. You may return to your seat. If you do not return to your seat, you will be bound and gagged.

CONRAD HAMPTON: Bound and gagged?

THE COURT: Yes.

CONRAD HAMPTON: What do you mean bound and gagged? I have a right to freedom of speech.

THE COURT: He is ordered bound and gagged. I have made an order. He is to be bound and gagged. Anybody else that makes one move is going to be bound and gagged.

[Appellant] DONALD GROSSMAN: Bound and gag all of us right now.

THE COURT: Very well, gentlemen.

[Appellant] GERALD FORD: Just bound and gag me.

DONALD GROSSMAN: If one is bound and gagged, we will all be bound and gagged. If one of our organization is bound and gagged. This is the position of

the Move Organization. We will not be separated. We will always be united. If you bound and gag one member of Move Organization, you must bound and gag all members of Move Organization. This is our position. We will not compromise.

THE COURT: You may return to your seats. Everyone is to be bound and gagged.

GERALD FORD: This is a disruptive tactic. This is something you have implemented. You afforded an opportunity to make a statement, then you cut him off. Now you are attempting to cut off the principle of freedom of speech in a Court of law. That is supposed to be justice, the same type of disruptive tactic that the law enforcement officers took, to get us bound when we walked in under your authority, and you will be held accountable for it.

THE COURT: Is there any reason why my order is not being complied with?

AFRICA AFRICA: Move said nothing, but because of the Monday, January 13th incident, they put in security guards. They should be removed from the Court room. They have been intimidating the Move Organization.

(At this point there was a general disruption in the Court room and the Judge left the Bench.)"

Following the noon recess, and with the mediation of a Philadelphia city councilman, appellants were permitted to return to the courtroom without restraints, on their promise that they would conduct themselves in an orderly manner. Shortly after the afternoon proceedings began, appellants asked the court to grant a mistrial, claiming that the court had demonstrated its prejudice against them during the morning session. They stated that if this motion were denied, they would stand mute for the "continuance of the trial." The motion was denied. The rest of the Commonwealth's witnesses were

examined on direct and cross without incident. A demurrer to the Commonwealth's evidence was overruled, and appellants began to present their defense.

Inspector Fencil of the Civil Disobedience Unit of the Philadelphia Police was the first major defense witness. During the direct examination of Inspector Fencil, appellants in their questioning pursued their selective enforcement theory, and their exploration of what the officer considered to be profane. During direct examination of Inspector Fencil, a second disruption occurred:

"BY CONRAD HAMPTON:

Q. Inspector Fencil, were you there at the date in question when Move people were arrested?

A. Yes, I was.

Q. Were you in charge of that demonstration at that time?

A. I was in charge of the Civil Affairs Unit at the time.

Q. You were in charge?

A. That's correct.

Q. And you are telling me that you were in charge and you did not give orders to have people arrested?

A. I gave warnings.

Q. I am talking about arrested, to have Move people arrested?

A. No.

Q. You did not. Now Inspector Fencil, you say that the Move Organization used words like mother fucker, bastard and as now I am saying, do you see these words as profane?

MR. BUTLER: Objection.

THE COURT: Sustained.

BY CONRAD HAMPTON:

Q. I am saying, since you feel these words are profane, why would you take them home to your wife and

play them on tapes to your wife unless your wife was a mother fucker like you?

 MR. BUTLER: Objection.

 THE COURT: You will gag this defendant.

 DONALD GROSSMAN: All defendants will be gagged then.

 THE COURT: All the defendants will be gagged.

 AFRICA AFRICA: I'd like to make a motion to you. I want you to understand that your laws state that a person has freedom of speech. Anytime you try to stifle that so called freedom of speech, you are not talking about the law. You are talking about outlaw which is what the fuckin shit you got today. Don't your constitution say you got freedom of speech? When you try to stifle that freedom of speech, ain't you going against the law? Ain't you a fuckin outlaw?

 \*   \*   \*   \*   \*   \*   \*   \*

 (At this point the defendants were taken in the back to be gagged and there was a general disorder in the Court room, which was unreportable.)"

Following this second disruption, court was recessed until the next morning. At the opening of the session on January 16, 1975, the court on its own motion declared a mistrial and summarily found each of appellants guilty of contempt of court and sentenced them to terms of imprisonment. Appellants Hampton and Africa were found to have hurled abusive language at the court, appellant Grossman lay on the floor shouting to spectators, demanding to be bound and gagged, the remaining appellants left their seats to join in Grossman's demand that all MOVE members be bound and gagged, using obscenities to express their request. Africa, Hampton and Grossman were sentenced to ninety days in prison, the remaining appellants were sentenced to thirty days.[2]

---

**2.** This specification of the contemptuous acts is taken from the trial court's written opinion.

It is unclear whether an appeal was taken to the Court of Common Pleas of Philadelphia. The brief for the Commonwealth asserts that such an appeal was taken and denied for want of jurisdiction on January 23, 1975. There is, however, no entry of this appeal in the record. An earlier contempt case arising from another trial in the Municipal Court involving these same appellants was appealed to the Court of Common Pleas of Philadelphia and that appeal was denied for want of jurisdiction on December 12, 1974.[3] This Court, per Mr. Justice Nix, assumed jurisdiction of the appeal from the earlier contempt case by a grant of supersedeas and bail on December 13, 1974. On February 19, 1975, this Court assumed jurisdiction over these cases by a per curiam

---

3. We do not understand the basis upon which the court of common pleas could decline jurisdiction. Pa.R.Crim.P. 67 provides:

"(a) After conviction by an issuing authority in any summary proceeding, a defendant may appeal to the court of common pleas of the judicial district in which the conviction occurred."

The Municipal Court is an issuing authority within the definition of Pa.R.Crim.P. 3. Moreover, the Rules of Criminal Procedure for the Municipal Court of Philadelphia provide that any criminal conviction in the Municipal Court may be appealed to the Court of Common Pleas of Philadelphia, and rule 6002(d) provides that the procedure for summary cases in the Pennsylvania Rules of Criminal Procedure, including rule 67, shall apply unless a conflicting provision appears in the rules for the Municipal Court. Thus either source of rules of criminal procedure for the Municipal Court provides for appeal to the court of common pleas.

As stated in the text, it is unclear whether the convictions which are the subject of this appeal were first appealed to the court of common pleas. Though one might be tempted to claim that appellants have waived their right to appeal the contempt convictions by failing to appeal them to the court of common pleas, such is not the case. The rules of criminal procedure for the Municipal Court of Philadelphia state that:

"Immediately after the imposition of sentence, the judge shall inform the defendant:

(a) of his right to appeal for trial de novo within 15 days . . . ."

Pa.R.Crim.P. 6006(a). The notice required by rule 6006 was not given appellants, therefore it would be a gross injustice to find that they have waived a right about which they were required to be informed without that required notice.

grant of supersedeas and bail.[4] We vacate the judgments of sentence, discharge three appellants and remand four of the causes to the Municipal Court of Philadelphia for a new trial on the contempt charges.[5]

## II

The purpose of a criminal trial is to determine the guilt or innocence of the accused.[6] Any conduct not directed to this end is improper and should be controlled by the court.[7] "[I]t is ultimately the authority and responsibility of the trial judge which must be exercised to maintain the atmosphere appropriate for a fair, rational and civilized determination of the issues . . . ." [8]

Special problems seem to be presented when people who believe that the "system" ought to be on trial are themselves on trial for violations of the law. Such persons, apparently having no faith in the constitutional process and procedures of courts of law, feel no obligation to cooperate, even passively, with those courts. The law is not concerned with their lack of faith in the judicial process. Our system of government is founded on

4. Of course, if jurisdiction did not lie with this Court to hear either the earlier contempt case or this contempt case, the proper procedure would have been to transfer them to the court which did have jurisdiction. This Court accepted jurisdiction, in part, because the Commonwealth urged that both the jurisdictional and substantive issues deserved our attention.

5. On February 27, 1975, the Commonwealth's motion to withdraw prosecution on all original charges against all seven appellants was granted.

6. American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Function of the Trial Judge § 1.1, at 25 (Approved Draft 1972); American Bar Association Project on Standards for Criminal Justice, Standards Relating to the Judge's Role in Dealing With Trial Disruptions § A.2, at 5 (Tent. Draft 1971) (incorporated with some changes, into Standards Relating to the Function of the Trial Judge).

7. ABA Standards Relating to the Function of the Trial Judge §§ 6.3–.5, 6.8–.11, at 80–84, 88–92; ABA Standards Relating to the Judge's Role in Dealing With Trial Disruptions at 8–18.

8. ABA Standards Relating to the Judge's Role in Dealing With Trial Disruptions § A.2 commentary, at 5.

the precept that everyone has the right to believe what he will, whether that belief is held by millions or by one.

The weight of the law comes to bear on such persons only when they move deliberately to disrupt the judicial process. When such disruptions occur, courts properly act to defend themselves, their process and, ultimately, the system by which the people of our nation have chosen to assure that each man may have his conduct justly measured against the norms of conduct prescribed in the criminal law.[9] Disruptions in a court of law, of whatever kind, threaten the ability of the court to act justly. As a consequence, they cannot be tolerated.

Here we are confronted with a case in which people who had demonstrated to express their dissatisfaction with certain aspects of the "system" were on trial for charges arising out of that demonstration. They sought and received permission to represent themselves.[10] Then, given this license, they proceeded to defend themselves. They quickly came to realize that their trial strategy was vindicating neither their actions nor their views.[11] Frustrated and disappointed, they began to play to the audience. The court was required, by

9. "It would degrade our country and our judicial system to permit our courts to be bullied, insulted, and humiliated and their orderly progress thwarted and obstructed by defendants brought before them charged with crimes. As guardians of the public welfare, our state and federal judicial systems strive to administer equal justice to the rich and the poor, the good and the bad, the native and foreign born of every race, nationality, and religion."
*Illinois v. Allen,* 397 U.S. 337, 346, 90 S.Ct. 1057, 1062, 25 L.Ed.2d 353 (1970).

10. This right is guaranteed by the sixth amendment to the Federal Constitution, when a valid waiver of counsel is made. *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975).

11. This is often the result of a layman's attempt to represent himself in a court of law. Both Mr. Justice Douglas and Mr. Chief Justice Burger characterize such attempts as "foolish." *Mayberry v. Pennsylvania,* 400 U.S. 455, 462, 91 S.Ct. 499, 503, 27 L.Ed.2d 532 (1971) (Douglas, J.); id. at 468, 91 S.Ct. at 506, 27 L. Ed.2d 532 (Burger, C. J., concurring opinion).

its duty to defend the judicial process, to control the defendants and to keep the trial focused on the narrow issue of guilt or innocence.

In this case the court chose to control the defendants by binding and gagging them. Though this was an alternative which was within the court's discretion to use,[12] we must express our disapproval [13] of its use here. In a trial which is already charged with emotion, the sight of manacled and gagged defendants can do nothing to reduce tensions. "It offends not only judicial dignity and decorum, but also that respect for the indi-

12. "We think there are at least three constitutionally permissible ways for a trial judge to handle an obstreperous defendant . . . : (1) bind and gag him, thereby keeping him present; (2) cite him for contempt; (3) take him out of the courtroom until he promises to conduct himself properly."
Illinois v. Allen, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).

13. We do not, today, hold that binding and gagging a defendant is always an improper sanction to be imposed upon a disruptive defendant. We do, however, wish to indicate that it is a strongly disfavored remedy, and may, in an appropriate case, be found to be improper.
"But even to contemplate [binding and gagging a defendant], much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold."
Illinois v. Allen, 397 U.S. 337, 343–44, 90 S.Ct. 1057, 1061, 25 L. Ed.2d 353 (1970).
We express our disapproval of binding and gagging as a method for the control of disruptive defendants in this case. Our disapproval should not, however, be understood to imply that binding and gagging a disruptive defendant is never acceptable. If, for example, the trial court determined that the defendant's presence in the courtroom were crucial to his defense, binding and gagging him as long as he continued to disrupt the proceedings may be an appropriate measure. However, in most cases suitable alternatives should be available. See Illinois v. Allen, id.; ABA Standards Relating to the Function of the Trial Judge; ABA Standards Relating to the Judge's Role in Dealing With Trial Disruptions.

vidual which is the lifeblood of the law." [14]  A gagged defendant cannot communicate [15] and cannot conduct a defense, and thus normally has no place in a court of law.

Courts have, in recent years, been confronted with many disruptive defendants. The legal community and the courts have developed techniques by which such defendants may be tried as fairly and in as orderly a manner as possible.[16]

Potentially disruptive defendants, like all defendants, have the right to represent themselves if counsel is validly waived.[17]  Whenever a defendant seeks to represent himself, and particularly when he may be disruptive, standby counsel should be appointed.[18]  The court should explain to the defendant the standards of

14. Id. at 350–51, 90 S.Ct. at 1064, 25 L.Ed.2d 353 (Brennan, J., concurring opinion).

15. "Moreover, one of the defendant's primary advantages of being present at the trial, his ability to communicate with his counsel, is greatly reduced when the defendant is in a condition of total physical restraint."
*Illinois v. Allen*, 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).

16. See ABA Standards Relating to the Functions of the Trial Judge;  ABA Standards Relating to the Judge's Role in Dealing With Trial Disruptions.

17. See note 9, supra.

18. "When a defendant refuses counsel  .  .  .  or seeks to discharge him, a trial judge is well advised—as so many do—to have such 'standby counsel' to perform all the services a trained advocate would perform  .  .  .  .  No circumstance that comes to mind allows an accused to interfere with the absolute right of a trial judge to have such 'standby counsel' to protect the rights of accused persons 'foolishly trying to defend themselves,'  .  .  .  .  The value of the precaution of having independent counsel, even if unwanted, is underscored by situations where the accused is removed from the courtroom under *Illinois v. Allen*.  The presence of counsel familiar with the case would at the very least blunt Sixth Amendment claims  .  .  .  when the accused has refused legal assistance and then brought about his own removal from the proceedings."
*Mayberry v. Pennsylvania*, 400 U.S. 455, 468, 91 S.Ct. 499, 506, 27 L.Ed.2d 532 (1971) (Burger, C. J., concurring opinion).

conduct he will be expected to observe.[19]   If the defendant misbehaves, he should be warned [20] that he will be removed from the court,[21] his right to represent himself will be considered waived,[22] and the trial will continue in his absence with standby counsel conducting the defense.[23] If the defendant again misbehaves, these measures should be taken.   The defendant must be made to realize that his disruptive tactics will result only in his exclusion from the courtroom.   His case will be tried according to law, in an attempt to do justice, whether he cooperates or not.

In this case the conduct of the defendants forced the declaration of a mistrial, despite the sanction imposed by the court.   Such a result is precisely the opposite of that sought to be obtained by the imposition of sanctions.   It is a defeat for the judicial system, because its orderly process has been frustrated.

19.   Such an explanation serves as a useful guide to the defendant who sincerely wishes to conform to the court's standards of behavior, and serves as a warning to the defendant who expects to disrupt the proceedings.

20.   "[W]e explicitly hold today that a defendant can lose his right to be present at trial if, after he has been warned by the judge that he will be removed if he continues his disruptive behavior, he nevertheless insists on [misbehaving].
*Illinois v. Allen,* 397 U.S. 337, 344, 90 S.Ct. 1057, 1061, 25 L.Ed.2d 353 (1970).

21.   See *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971); *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970).

22.   Although the constitutional right to represent oneself was developed in a post-*Allen* case, *Faretta v. California,* 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975), there is no reason to believe that the sixth amendment rights in *Faretta* are nonwaivable while those in *Allen* are waivable.   Misconduct by defendant can result in waiver of both his right to represent himself and his right to remain in the courtroom during his trial.   *Faretta* is not understood by this Court to cut back, in any way, the trial court's power to control a disruptive defendant.   See note 17, supra.

23.   See note 17, supra.

## III

Following the declaration of a mistrial, the trial judge summarily[24] found each of the defendants guilty of contempt of court and sentenced them to terms of imprisonment. The contumacious acts consisted in each case of profane language directed at the court, coupled with various disruptive acts. The court was personally attacked, and was subjected to abusive language and epithets. During the course of a trial, a summary proceeding to protect the orderly administration of justice is perfectly proper, even when the court is personally attacked.[25] The court must be able to control those appearing before it, and must be able to use its power summarily to avoid interference with the principal matter before the court.[26]

Once the trial is terminated for any reason, however, different considerations come to bear.[27] No legitimate

24. See Act of June 16, 1836, P.L. 784, § 23, 17 P.S. § 2041 (1962).

25. "As these separate acts or outbursts took place, the arsenal of authority described in *Allen* was available to the trial judge to keep order in the courtroom. He could, with propriety, have instantly acted, holding petitioner in contempt [for his personal attacks on the court], or excluding him from the courtroom, or otherwise insulating his vulgarity from the courtroom.

*Mayberry v. Pennsylvania,* 400 U.S. 455, 463, 91 S.Ct. 499, 504, 27 L.Ed.2d 532 (1971). See also *Codispoti v. Pennsylvania,* 418 U.S. 506, 513, 94 S.Ct. 2687, 2692, 41 L.Ed.2d 912 (1974).

26. "To preserve order in the courtroom for the proper conduct of business, the court must act instantly to suppress disturbance or violence or physical obstruction or disrespect to the court, when occurring in open court."

*Cooke v. United States,* 267 U.S. 517, 534, 45 S.Ct. 390, 394, 69 L.Ed. 767 (1924).

27. "When the trial judge, however, postpones until after trial the final conviction and punishment of the accused or his lawyer for several or many acts of contempt committed during the trial, there is no overriding necessity for instant action to preserve order and no justification for dispensing with the ordinary rudiments of due process . . . ."

*Codispoti v. Pennsylvania,* 418 U.S. 506, 513, 94 S.Ct. 2687, 2692, 41 L.Ed.2d 912 (1974). See also *Cooke v. United States,* 267 U.S. 517, 539, 45 S.Ct. 395, 396, 69 L.Ed. 767 (1924).

interest is served by permitting the court victimized by the attack summarily to convict and punish the defendants for contempt of court. There is no trial to be interrupted, there is no need to forestall future contumacious behavior, there is no reason to deny the defendants "the ordinary rudiments of due process." A summary conviction for contempt of court, after termination of a trial in which the court has been personally attacked, lends itself to charges that the court is exacting personal vengeance.[28] Whether this is the case need not concern us, for even the appearance of such motives on the part of a trial court is strictly to be avoided.[29] For this reason, four appellants [30] must be tried before a court that has not been directly subjected to their abuse.[31]

28. "It is a disservice to the law to sanction the imposition of punishment by a judge personally involved and therefore not unreasonably to be deemed to be seeking retribution, however unconsciously, at a time when a hearing before a judge undisturbed by any personal relation is equally convenient. It does not enhance a belief that punishment is a vindication of impersonal law; it does not fortify the deterrent function of punishment."
*Sacher v. United States,* 343 U.S. 1, 37, 72 S.Ct. 451, 468, 96 L.Ed. 717 (1952) (Frankfurter, J., dissenting opinion).

29. "In making this ultimate judgment [that petitioner is to be retried on the contempt charges before a judge other than the trial judge], the inquiry must be not only whether there was actual bias on [the trial court's] part, but also whether there was 'such a likelihood of bias or an appearance of bias that the judge was unable to hold the balance between vindicating the interests of the court and the interests of the accused.' . . . 'Such a stringent rule may sometime bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less."
*Taylor v. Hayes,* 418 U.S. 488, 500–03, 94 S.Ct. 2697, 2704–05, 41 L.Ed.2d 897 (1974). See also *Mayberry v. Pennsylvania,* 400 U.S. 455, 465, 91 S.Ct. 499, 505, 27 L.Ed.2d 532 (1971).

30. Specifically, Africa Africa, Conrad Hampton, Gerald Ford and Donald Grossman.

31. Our holding is required by the fifth and fourteenth amendments to the Federal Constitution; *Codispoti v. Pennsylvania,* 418 U.S. 506, 94 S.Ct. 2687, 41 L.Ed.2d 912 (1975); *Taylor v. Hayes,* 418 U.S. 488, 94 S.Ct. 2697, 41 L.Ed.2d 897 (1975); *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971).

## IV

Three appellants [32] correctly assert that the record does not support their contempt convictions. Review of the trial transcript reveals that there is no evidence of the contemptuous conduct cited by the trial court as the basis for the contempt convictions of three of the seven appellants. The trial court, however, in its opinion, written three months after the trial, stated that during one of the outbursts in the courtroom which the court reporter was unable to report, these three appellants jumped up, and in abusive language, demanded that the court bind and gag all of them.

We have no doubt that the court has accurately recited what transpired during this outburst in its presence. In *Commonwealth v. Young*, 456 Pa. 102, 317 A.2d 258 (1974), however, we held that a trial court's attempt to "correct" the official transcript of the proceedings during an appellant's trial was impermissible. "[T]his Court may not accept as correctly reflecting what occurred at trial, anything other than the original record or a record corrected in accordance with section 1199." *Commonwealth v. Young*, id. at 113–14, 317 A.2d at 264. See also *Commonwealth v. McDonald*, 459 Pa. 17, 326 A. 2d 324 (1974); *Commonwealth v. Lofton*, 389 Pa. 273, 133 A.2d 203 (1957).

If a trial court, for any reason does not wish to comply with section 1199, the only other procedure which may be followed, in cases such as this, was used by the trial court in *Commonwealth v. Patterson*, 452 Pa. 457, 460–61, 308 A.2d 90, 92 (1973). In that case the trial judge, following a violent disruption by several defendants in his courtroom, waited until order had been restored and then dictated to the court reporter a description of what had transpired during the outburst. This report was

32. These three are Merle C. Austin, Laverne Sims and Theodore Williamson.

then read to each of the defendants before the court imposed sentence for contempt of court. Thus the record was made in open court, it was part of the official records of the proceedings, and each defendant was able to refute, if necessary, the court's version of events.[33]

Because we may consider only the official record of the proceedings, it is clear, as previously indicated, that there is insufficient evidence to sustain the contempt of court convictions of three of the appellants. Once that is established, this case is no different than any other sufficiency of the evidence challenge. Because there is insufficient evidence to support a conviction, the appellants whose convictions are not supported by the evidence must be discharged. See *Commonwealth v. Stanley,* 453 Pa. 467, 475, 309 A.2d 408, 413 (1973); *Commonwealth v. Wright,* 449 Pa. 358, 362, 296 A.2d 746, 748 (1972); *Commonwealth v. Bailey,* 448 Pa. 224, 230, 292 A.2d 345, 347 (1972); *Commonwealth v. Walker,* 428 Pa. 244, 250, 236 A.2d 765, 768 (1968); *Commonwealth v. Bausewine,* 354 Pa. 35, 42, 46 A.2d 491, 494 (1946).

The remaining four appellants contend that (1) they were deprived of their right to make statements or present testimony on their own behalf at a hearing on the contempt charges, (2) their acts of contempt were caused by their defective waiver of counsel at the trial which gave rise to the contempt charges, and (3) the judge's recitations of the alleged contumacious conduct were too vague to permit informed appellate review.

The first contention is remedied by the grant of a new trial on the contempt charges. The second contention may be presented at that trial. The third is without merit. This Court had no difficulty understanding which acts of appellants were the basis for the trial court's findings of contempt.

**33.** The only change we would make to the procedure, as described, is to attribute the contumacious conduct of each defendant to him by name.

Judgments of sentence of appellants Merle C. Austin, Laverne Sims and Theodore Williamson reversed, and these appellants ordered discharged. Judgments of sentence of Africa Africa, Conrad Hampton, Gerald Ford and Donald Grossman vacated and causes remanded for a new trial of the contempt charges in conformity with this opinion.

MANDERINO, J., concurs in the result.

JONES, C. J., filed a dissenting opinion.

NIX, J., filed a dissenting opinion in which POMEROY, J., joins.

JONES, Chief Justice (dissenting).

I dissent. The law has long recognized the need for permitting a judge to summarily find a person in contempt of court where that person directly and seriously affronts the judicial process. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970); *Commonwealth v. Patterson,* 452 Pa. 457, 308 A.2d 90 (1973). However, the United States Supreme Court has established a significant limitation on the use of summary contempt citations, holding that unless the finding of contempt is an immediate response to the contemptor's conduct due process dictates that the contemptor have the right to a separate hearing on the charge of contempt. *Mayberry v. Pennsylvania,* 400 U.S. 455, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971). This limitation is a reflection of the balance struck by the court between (1) the need to insure the integrity and decorum of (our) judicial proceedings and (2) the need to insure the Constitutional due process rights of the individual faced with a possible jail sentence.

At first glance, the case before us appears to fit within the rule established in *Mayberry, supra,* that is, that since the appellants were not held in contempt until the

morning following the contemptuous conduct a summary proceeding was not permissible. A closer examination, however, reveals the fallacy of such a view.

Here, the judge was faced with a number of boisterous and profane defendants proceeding pro se and a courtroom full of their followers. Throughout the day of trial preceding the contempt finding the judge, witnesses, spectators and court employees were assaulted verbally by the defendants and their friends. The judge on numerous occasions attempted to reestablish order and finally late in the day directed the police to bind and gag the defendants. It was this final attempt by the judge which lead to a general uproar from the defendants' followers in the audience. The judge, recognizing the danger inherent in the situation, i. e., an imminent violent outbreak, ordered the trial adjourned until the next day. Upon reconvening in the morning, a mistrial was ordered and the defendants were held in contempt.

It was the conduct of the defendants and of their followers which brought about the need for an immediate adjournment. To have cited the defendants for contempt at such a volatile point would almost certainly have touched off a small scale riot, which would have further affronted the court's integrity and decorum, in addition to placing all of those present in physical danger. Under these circumstances, the delaying of the contempt citation until the following day was the trial judge's only alternative. The conduct was certainly of such a nature as to warrant the imposition of summary contempt.

The majority's holding today places all judges in the precarious position of having to bow to the physical intimidation of every large group acting in unison before the courts. That is, in every instance where a group can present sufficient physical danger as to warrant an immediate adjournment they can effectively delay indefinitely any punishment for said conduct. Each time the

hearing on the initial contemptuous conduct is held the same conduct can be brought to bear, rendering the subsequent process impossible. The judge then is faced with citing instantly for contempt and men quelling the ensuing fracas or further delaying. This situation seems unworkable.

Here, the judge did what he felt was necessary to protect himself, the spectators, and the court employees by adjourning the trial. He delayed the contempt citation until the following morning when the group was not at such a frantic peak. The citation of contempt at that time was for all intent and purposes an immediate response to the contemptuous conduct, in that it was rendered at the next possible moment after said conduct. The fact that that moment came the following morning was a product of the defendants' conduct rather than of the court and should therefore not serve to strip the court of its long recognized summary contempt power in this case. Therefore, I would affirm.

NIX, Justice (dissenting).

This matter presents an appeal from a summary conviction in the Municipal Court of Philadelphia County, for alleged contemptuous conduct by appellants in the presence of the court.[1]  I dissent from the opinion expressed by the majority because I do not believe that the merits of this appeal are properly before the Court for our review.

The Municipal Court of Philadelphia was created under Article 5 Section 6(c) of the Pennsylvania Constitution to replace the previously existing magistrate courts of that county. Appeals from the Municipal Court are

1.  "The judges of the municipal court shall have the same power to issue attachments and punish for contempt as the judges of the courts of common pleas of this Commonwealth." 1969, Oct. 17, P.L. 259, § 17, 17 P.S. § 711.17 (Supp.1975).

governed by the Act of October 17, 1969, P.L. 259, § 19, 17 P.S. § 711.19 (Supp.1975) which provides:

"Any party may appeal the judgment of the municipal court to the Common Pleas Court of Philadelphia within thirty days of the entry of judgment: Provided, however, That appeals from summary convictions in municipal court shall be governed by the Minor Judiciary Court Appeals Act."

Since the action taken below was a summary conviction,[2] we then must look to the provisions of the Minor Judiciary Court Appeals Act for further instruction as to the appropriate appellate procedure in this case. The Minor Judiciary Court Appeals Act sets forth the following appeal procedure:

"§ 3003.   Summary proceedings.

(a) *In all cases of summary proceedings,* the defendant, upon conviction by an issuing authority, may appeal to the court of common pleas of the judicial district in which the minor judiciary court is held.

\*       \*       \*       \*       \*       \*       \*       \*

(f) Upon the filing of the transcript and other papers of the proceeding by the issuing authority, *the case shall be heard de novo* by the appropriate division of the court of common pleas as the president judge shall direct." (Emphasis added).

The cited portions of Section 3003 of the Minor Judiciary Court Appeals Act were retained by Pa.R.Crim.P. 67(a) and (e) adopted September 18, 1973, and made effective January 1, 1974. See also, Pa.R.Crim.P. 159(e). Significantly, section (f) of Rule 67 provides:

"This rule shall provide the exclusive means of appealing from a summary conviction. Courts of common pleas shall no longer issue writs of certiorari in such cases."

2.   The action of the court below was pursuant to Act of June 16, 1836, P.L. 784, § 23 III; 17 P.S. § 2041 III.

Thus, it appears clear that these appellants were entitled to an appeal which consisted of a trial de novo in the Court of Common Pleas as a matter of right. Therefore, the Court of Common Pleas of Philadelphia County may not refuse to entertain jurisdiction in cases of this type where an appeal has been timely filed in accordance with the pertinent rules. The obvious remedy, in my judgment, would be to remand the cause to the Court of Common Pleas with instructions that they proceed in accordance with statutes of this Commonwealth and the Rules of this Court.

On the contrary, the majority has seen fit to all but ignore the question of jurisdiction [see footnote 3 in majority opinion] and address at length the merits. The initial fallacy with this approach is that these appellants were entitled to a trial de novo as a matter of right regardless of the merits. I fully recognize that the reason behind the rule permitting an absolute right for a trial de novo in the Common Pleas Court is the fact that the Municipal Court's procedure does not provide an opportunity for trial by jury. I am also aware that it would be reasonable to restrict this type of appeal to those cases where the accused is entitled to trial by jury in the first instance. However, such a distinction has not been made, but rather the pertinent statutes and rules expressly afford this method of appeal in the cases of summary proceedings. Under these circumstances, there is no basis to justify a deviation from the prescribed procedure.

I am further distressed because the course chosen by the majority encourages disruption of the orderly process of appellate review established by the enactment of the Appellate Court Jurisdiction Act of 1970. 1970, July 31, P.L. 673, No. 223, art. I, § 101 et seq.; 17 P.S. 211.-101 et seq. (Supp.1975–76). The majority accepted jur-

isdiction of this appeal under Section 503(a) which provides:

"The failure of an appellee to file an objection to the jurisdiction of an appellate court on or prior to the hearing of the appeal, or within such earlier time as may be specified by general rule or rule of court, shall, unless the appellate court shall otherwise order, operate to perfect the appellate jurisdiction of such appellate court, notwithstanding any provision of this act, or of any general rule adopted pursuant to section 505 of this act, vesting jurisdiction of such appeal in another appellate court." (Footnote omitted).

I do not believe that this section should be used to allow parties to select their forum for an appeal where it is obvious that the jurisdiction lies elsewhere. This particular· provision serves a salutary purpose where there is a serious question as to where jurisdiction lies between the court chosen and another court. Here it is unquestioned that the direct appeal would not lie in this Court, thus I do not believe jurisdiction should have been accepted under Section 503(a).

As noted by the majority, earlier contempt cases, also involving members of the group to which instant appellants belong, were appealed to this Court and jurisdiction was accepted. In those cases the parties had appealed from Municipal Court orders of contempt to the Common Pleas Court. Their appeals were dismissed for want of jurisdiction. In view of Article 5 Section 9 of the Pennsylvania Constitution which guarantees a right of appeal in all cases and after a study of the Appellate Court Jurisdiction Act which does not, in my judgment, provide for a direct appeal from a judgment of criminal contempt by a judge of the Municipal Court to the Common-· wealth Court, Superior Court or this Court, I was of the view that the order of the Common Pleas Court denying the appeal for want of jurisdiction presented an issue of immediate public importance which would justify our as-

sumption of plenary jurisdiction pursuant to Section 205.[3] I remain of that view.

Although the procedural posture in those cases was different in that there was formal action by the Court of Common Pleas the underlying issue remains the same, i. e., whether the Common Pleas Court had jurisdiction in these cases.[4] Since the instant matter was ripe for decision prior to the earlier appeals, the question of jurisdiction should have been decided. Had the course been followed, there would have been no necessity to reach the merits.

Accordingly, I would transfer the matter to the Court of Common Pleas to proceed with a de novo appeal for all appellants.

POMEROY, J., joins in this dissent.

3. That section provides:
"Notwithstanding any other provision of law, the Supreme Court may, on its own motion or upon petition of any party, in any matter pending before any court or justice of the peace of this Commonwealth involving an issue of immediate public importance, assume plenary jurisdiction of such matter at any stage thereof and enter a final order or otherwise cause right and justice to be done."

4. While the desirable procedure would have been for appellants to have lodged their appeal in the Court of Common Pleas, their failure to do so is understandable in light of that Court's clear pronouncement that it did not have jurisdiction in these matters.