COMMONWEALTH of Pennsylvania,
Appellee

v.

Katrina MOODY, Appellant.

Commonwealth of Pennsylvania,
Appellee

v.

Barbara Ivery, Appellant.

Commonwealth of Pennsylvania,
Appellee

v.

Bernadette Archie, Appellant.

Superior Court of Pennsylvania.

Argued March 14, 2012.

Filed May 15, 2012.

Reargument Denied July 18, 2012.

Bradley Bridge, Public Defender, Philadelphia, for Moody, appellant.

Andrew D. Montroy, Public Defender, Philadelphia, for Ivery, appellant.

Joseph J. Russo, Philadelphia, for Archie, Appellant.

Karen B. Jordan, Assistant District Attorney, Philadelphia, for Commonwealth, appellee.

BEFORE: GANTMAN, SHOGAN, and WECHT, J.J.

**OPINION BY WECHT, J.:**

Katrina Moody, Barbara Ivery, and Bernadette Archie ["Appellants"], appeal their May 6, 2011 judgments of sentence imposed after the Philadelphia Municipal Court found each of them in direct criminal contempt.[1] Because Appellants' due process rights were violated, we vacate the judgments of sentence and remand for proceedings consistent with this opinion.[2]

On April 6, 2011, during the preliminary hearing in a double homicide case, Appellant Archie stood up in the gallery and began screaming. This occurred as the court crier attempted to bring the homicide defendant's mother from the gallery to the bench to testify. Appellant Archie's act served to incite others seated in the gallery, including the other two Appellants, Moody and Ivery, who then attacked the homicide defendant's mother in the gallery. When the homicide defendant saw his mother being assaulted, he broke free from the deputy sheriff, began banging on the wall, and attempted to run into the gallery. Contempt Hearing Notes of Testimony ["N.T."], 4/6/11, at 6. The deputy sheriff had to wrestle with the defendant in order to prevent him from reaching the gallery. N.T. at 6. The trial court halted the proceedings and removed Appellants from the courtroom to an adjoining room for three hours.

After order was restored, the trial court held what it believed to be a summary contempt hearing. The court crier was sworn in as a witness, but the municipal

---

1. Pursuant to 42 Pa.C.S.A. § 1123(a.1), Appellants have the right to appeal to this Court a contempt citation issued by a municipal court judge, but the appeal "shall be limited to a review of the record." 42 Pa.C.S.A. § 1123(a.1).

2. These appeals previously were listed consecutively as related docket numbers. The three cases were consolidated for argument before this Court, and are disposed of in this opinion. These cases arise from the same incident, each Appellant presents identical issues, and all matters were argued together before us.

court judge was not. N.T. at 4–5. In that proceeding, the municipal court judge and the court crier made a record of the melee, as follows:

THE COURT: All right. For the record, what happened was—let me just put on the record what happened that I observed.

What happened that I observed was we tried to bring the defendant's mother in as a witness to testify as to whether or not she hired an attorney for the defendant. That's all.

When the court officer went out to get the mother, a fight broke out in the gallery involving numerous people in which the court officer got stuck in the middle and his arm was hit during the proceeding. He can tell us more about what happened.

Because of that, we had to shut down the court, call the sheriff. Almost every free sheriff in the building came running in here. We locked down the courtroom. The defendant went nuts and started banging on the wall because he saw his mother being assaulted. The door got locked. And the sheriff had to wrestle with the defendant while all this happened, all because of what happened in the gallery of the courtroom.

All right. Mr. Brandt, do you want to tell me what happened when you were out there?

\* \* \*

THE WITNESS: Yes, Your Honor. I went out there to get the mother of the defendant. And when I went out there, the people were screaming. There's a lady in a tan suit jacket. She was sitting on the left side of the court or the right side from the bubble. She was holding a piece of paper up, screaming F you. She was saying things, but I wasn't really paying attention. I just told her to sit down.

Another staff member came out and told people to be quiet. The District Attorney was out there telling people to calm down.

As I approached the defendant's mom, someone on the second row—I cannot identify this person—threw a pocketbook, and it hit the lady in the side of the face.

THE COURT: Which lady?

THE WITNESS: The defendant's mom.

THE COURT: Okay.

THE WITNESS: And when it did that, this lady here in the orange sweater—between me and the District Attorney, she was running between us screaming. And we tried to hold her back. But as we were trying to hold her back, she got to the mother. And she reached for her hair and pulled her hair and then with a left hand threw and hit her on the left side of her head.

At which time there was [sic] other people coming towards us. I pushed her with my left hand and she went backwards. I believe another court staff member may have grabbed her from behind and pulled her away.

I pushed the woman who was being attacked to the right of that pillar. At which time this woman here can [sic] around the pillar.

THE COURT: Can you please describe—

THE WITNESS: I'm sorry. The woman in the white sweatshirt.

THE COURT: Thank you.

THE WITNESS: She came up from behind from the second row. She reached around to the defendant's mother. And all I remember seeing is her index finger going into the woman's eye and ripping her eye. Now, I don't know if she was trying to pull her or trying to

rip her eye, but she was using a ripping motion at her eye. At which time they started to engage in a fight.

I tried to push the woman away.

Punches were being thrown back and forth. I was trying to push her away. And then the detective in the black suit—I think it was Pitts—he may have grabbed that woman from behind and pulled her off. We separated the two parties.

At the same time other things were going on. I don't know who the people were. Somebody was trying to hit somebody with a cane. And some other people were throwing punches. And I just can't identify more than those two people and the lady in the tan jacket, who I thought started a lot of the situation.

THE COURT: The lady in the tan jacket, do you see her here?

THE WITNESS: She is the lady back there, Your Honor, in the third—putting her hand up in the air, You Honor, right now. In fact, we even had communications outside the courtroom.

THE COURT: All right. Do you want to come in here, ma'am?

Sit down in the table between those two ladies.

All right. Go ahead. The lady in the tan was doing what?

THE WITNESS: Well, to be honest with you, I just forgot that part. Originally, when you were asking the defendant about his attorney status, he said something about a Mr. Sutton. And you said that if he doesn't have an attorney, Mr. Server, do you know about that, she jumped up with a picture in her hand and started screaming something out. We can't really hear what she was screaming, but she was rising and she was starting, like, to screaming and get

a little—just a little crazy I guess. And I got on the mic and said, everybody calm down, sit down. And she did sit back down.

And then you asked me to go get the mother. I went to go get the mother. When I went out to get the mother, I didn't know who the mother was. So I went to my paperwork and I said, Miss Warrick, are you here? Is the mother of Shaun Warrick here?

And she didn't answer right away. And that lady said, she's right here. And the lady said, I can speak for myself. And then she started screaming at her. And that's when the District Attorney was telling her to calm down, ma'am, and trying to go to her. And that's when the whole—that's when it started from A, B, and C.

THE COURT: Okay.

THE WITNESS: And then it went into the fight. She didn't throw any punches, not that I know of, or accost the lady. But she did excite the situation in the beginning.

THE COURT: All right.

THE WITNESS: That's about basically all I know. And then we locked the room down. And other than that, I can't remember much. I just focussed [*sic*] on those two things.

N.T. at 5–12.

At this hearing, Appellants were not represented by counsel, were not permitted to speak on their own behalves, and were not able to cross-examine the judge or crier who were the witnesses. N.T. at 14, 16. The trial court then required each Appellant to state her name on the record. N.T. at 12–13. An attorney who was not involved in the case interrupted the hearing and requested to meet with the judge at sidebar, a request which the judge allowed. N.T. at 12. The sidebar conference was not recorded. Thereafter, the

municipal court judge told the Appellants that they had a Fifth Amendment right, instructed them not to testify, and stated that he would appoint an attorney for each Appellant. N.T. at 13. The trial court indicated that it was "making an initial finding of direct criminal contempt of court." N.T. at 13–14. The judge stated that "before I make a final finding, I want you to have attorneys to be able to talk to you so you can present your case." N.T. at 16. In accordance with this initial finding, the court set bail on each Appellant at $25,000, with only 10% required to be paid for release. Bail Order, 4/6/2011. Each Appellant posted bail that same day.

The counseled proceeding ensued approximately one week later, on April 13, 2011. It was, in effect, a sentencing hearing. The attorneys were allowed only to present mitigating evidence relevant to sentencing. Sentencing Hearing Notes of Testimony ["S.N.T."], 4/13/11, at 8, 14. The sentencing hearing of Appellant Archie was stayed because her attorney was recovering from surgery. S.N.T., 4/13/11, at 5. Counsel for the two Appellants present specifically requested permission to present evidence on the contempt charge and to cross-examine witnesses. S.N.T., 4/13/11, at 10, 13. The trial court denied those requests. S.N.T., 4/13/11, at 13–14.

The trial court declined to allow counsel to provide any evidence regarding the events that transpired in court. The trial court proposed a flat, ten-day sentence as to the two Appellants present, but, at their request, stayed sentencing of all Appellants until May 6, 2011, the date of Appellant Archie's sentencing hearing. S.N.T. 4/13/11 at 23, 25–26.

On April 25, 2011, Appellant Moody filed a post-sentence motion seeking various forms of relief, including an arrest of the judgment, a new trial, or a new sentencing hearing.[3] At the subsequent sentencing hearing on May 6, 2011, the trial judge granted the motion in part and denied it in part. The sole portion of the motion that the trial court granted was Appellants' request to modify the sentence to five to ten days as to Appellants, in conformity with the Sentencing Code.[4] Sentencing Hearing Notes of Testimony ["S.N.T."], 5/6/11, at 11.

Thereafter, Appellants appealed.[5] The trial court permitted Appellants to remain free on bond pending appeal. S.N.T., 5/6/11, at 13.

The three Appellants present the same issues for our review:

1) The evidence against [Appellants] was legally insufficient and [their] contempt conviction[s] must be vacated because no one at [their] contempt trial identified [them] as having done anything.

2) [Appellants'] criminal contempt trial was defective where [Appellants] [were] denied [their] right to counsel,

---

3. On May 3, 2011, Appellant Ivery filed a combined motion for continuance and post-sentence motion, which included a request to present witnesses. The trial court denied the motion. S.N.T, 5/6/11, at 11. Counsel for Appellant Archie requested to adopt the post-sentence motion filed by counsel for Appellant Moody for purposes of appeal, but the trial court denied such an adoption, instead giving Appellant Archie's counsel ten days to file post-sentence motions. S.N.T., 5/6/11, at 25–27. Appellant Archie filed no such motions.

4. The Sentencing Code does not permit the issuance of flat sentences. Sentences must have both a minimum and maximum term. 42 Pa.C.S.A. § 9756(a)-(b).

5. The trial court ordered a statement of errors complained of on appeal pursuant to Pa. R.A.P. 1925(b). Appellants timely complied. The trial court filed a Rule 1925(a) opinion.

[were] denied [their] right to cross-examine the witness against [them], [were] denied [their] right to present evidence and [were] denied [their] right to testify on [their] own behalf.

3) By eschewing consideration of the character of [Appellants] and [their] rehabilitative needs, the trial judge abused his discretion and violated general sentencing principles when he focuses exclusively upon the crime involved (contempt) in sentencing [Appellants].

Brief of Appellant Moody at ii; [6] *see* Brief of Appellant Archie at 3; Brief of Appellant Ivery at 3.

■ Appellants' second issue on appeal amounts to a due process challenge to the validity of the entire proceeding that culminated in their convictions for direct criminal contempt. Whether Appellants were denied due process is a question of law. "As with all questions of law, the appellate standard of review is *de novo* and the appellate scope of review is plenary." *In re Wilson*, 879 A.2d 199, 214 (Pa.Super.2005) (*en banc* ).

In order to determine what process is due, we first must determine the nature of the contempt proceeding. Only then will we be in a position to evaluate Appellants' first issue, which concerns the sufficiency of the evidence, and their third issue, which concerns sentencing.

■ Use of the court's summary contempt power is reviewed under an abuse of discretion standard. *Commonwealth v. Stevenson*, 482 Pa. 76, 393 A.2d 386, 393 (1978) (plurality opinion).

We have held that in considering an appeal from a contempt order, we place great reliance on the discretion of the trial judge. Each court is the exclusive judge of contempts against its process, and on appeal its actions will be reversed only when a plain abuse of discretion occurs. In cases of direct criminal contempt, that is, where the contumacious act is committed in the presence of the court and .disrupts the administration of justice, an appellate court is confined to an examination of the record to determine if the facts support the trial court's decision.

*Commonwealth v. Jackson*, 367 Pa.Super. 6, 532 A.2d 28, 31–32 (1987) (quotations and citations omitted); *see also* 42 Pa. C.S.A. § 1123(a.1) ("the appeal shall be limited to a review of the record"). The trial court characterized the contempt proceeding as a summary hearing. For the reasons that follow, we find that this proceeding was not in the nature of a summary hearing.

■ Contempt is either civil or criminal in nature. "The determination of whether a particular order contemplates civil or criminal contempt is crucial, as each classification confers different and distinct procedural rights on the defendant." *Commonwealth v. Ashton*, 824 A.2d 1198, 1202 (Pa.Super.2003). Indeed, "[t]he civil-criminal classification of contempt exists solely for determination of a contemnor's procedural rights and a court's sentencing options." *Diamond v. Diamond*, 715 A.2d 1190, 1198 (Pa.Super.1998). "If the dominant purpose of the court is to prospectively coerce the contemnor into compliance with the court's directive, the adjudication is one of civil contempt." *Commonwealth v. Pruitt*, 764 A.2d 569, 574 (Pa.Super.2000) (citing *Diamond*, 715 A.2d at 1194). "However, if the court's dominant purpose is to punish the contemnor for

---

**6.** Appellants' original issue contained several erroneous capital letters that we corrected for ease of reading. Otherwise, the issues are set forth *verbatim*.

disobedience . . ., the adjudication is one of criminal contempt." *Id.*

■ "Criminal contempts are further subdivided into direct and indirect contempts." *Knaus v. Knaus,* 387 Pa. 370, 127 A.2d 669, 671 (1956). Different procedural safeguards apply to direct and indirect criminal contempts. "A charge of indirect criminal contempt consists of a claim that a violation of an Order or Decree of court occurred outside the presence of the court." *Commonwealth v. Brumbaugh,* 932 A.2d 108, 109 (Pa.Super.2007) (citing *Commonwealth v. Padilla,* 885 A.2d 994 (Pa.Super.2005)). Direct contempt involves conduct occurring in the presence of a court. *Commonwealth v. Patterson,* 452 Pa. 457, 308 A.2d 90, 92 (1973). In the case *sub judice,* Appellants were found guilty of direct criminal contempt. Direct criminal contempt often requires immediate adjudication in the form of a summary hearing.

> A direct criminal contempt consists of misconduct of a person in the presence of the court, or so near thereto to interfere with its immediate business, and punishment for such contempts may be inflicted summarily.

*Id.* (quoting *Knaus,* 127 A.2d at 671).

■ Due process requirements necessarily are truncated in summary proceedings. "Summary proceedings for contempt of court are those in which the adjudication omits the usual steps of 'the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial.'" *Stevenson,* 393 A.2d at 392 (quoting *Sacher v. United States,* 343 U.S. 1, 13, 72 S.Ct. 451, 96 L.Ed. 717 (1952)).

■ However, a defendant may not be summarily tried for an offense, including direct criminal contempt, in which he is subject to a term of imprisonment without being furnished counsel or without validly waiving counsel. *See Commonwealth v. Crawford,* 466 Pa. 269, 352 A.2d 52, 53–54 (1976) (citing *Argersinger v. Hamlin,* 407 U.S. 25, 32, 92 S.Ct. 2006, 32 L.Ed.2d 530 (1972)); *Commonwealth v. Bethea,* 445 Pa. 161, 282 A.2d 246, 247–48 (1971). Further, "[w]hen the summary contempt power is exercised, there should normally be afforded 'at least a summary opportunity to adduce evidence or argument relevant to guilt or punishment.'" *Stevenson,* 393 A.2d at 397 n. 9, (citations omitted).

■ The power to impose summary punishment for contempt is inherent in all courts, *Id.,* 393 A.2d at 389, but is limited in this Commonwealth by 42 Pa.C.S.A. § 4132. That statute, denominated "Attachment and summary punishment for contempts," provides:

> The power of the several courts of this Commonwealth to issue attachments and to impose summary punishments for contempts of court shall be restricted to the following cases:
>
> (1) The official misconduct of the officers of such courts respectively.
>
> (2) Disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court.
>
> (3) The misbehavior of any person in the presence of the court, thereby obstructing the administration of justice.

42 Pa.C.S.A. § 4132.

■ "To sustain a conviction pursuant to section 4132(3) . . . it must be established beyond a reasonable doubt that Appellant (1) committed misconduct, (2) in the presence of the court, (3) with the intent to obstruct the proceedings, and (4) Appellant's misconduct actually obstructed the administration of justice." *Pruitt,* 764

A.2d at 575 (citing *Behr v. Behr*, 548 Pa. 144, 695 A.2d 776, 779 (1997)).

■ Summary contempt adjudication is appropriate only when the conduct occurred in the judge's presence:

> Where a court acts immediately to punish for contemptuous conduct committed under its eye, the contemnor is present, of course. There is then no question of identity, nor is hearing in a formal sense necessary because the judge has personally seen the offense and is acting on the basis of his own observations. [FN 8]
>
> [FN8: The Court has been careful to limit strictly the exercise of the summary contempt power to cases in which it was clear that all of the elements of misconduct were personally observed by the judge. *See Johnson v. Mississippi*, 403 U.S. 212, 214–215 [91 S.Ct. 1778, 29 L.Ed.2d 423] (1971); *In re Oliver*, 333 U.S. 257, 275–276 [68 S.Ct. 499, 92 L.Ed. 682] (1948).]

*Groppi v. Leslie*, 404 U.S. 496, 504, 92 S.Ct. 582, 30 L.Ed.2d 632 (1972). "Only in these narrow circumstances may a court subject a contemnor to punishment without the procedural protections otherwise accorded the criminal accused." *Commonwealth v. Edwards*, 703 A.2d 1058, 1059 (Pa.Super.1997).[7]

Our Courts have long required that the contemptuous conduct actually be observed by the Court:

> Except for a narrowly limited category of contempt, due process of law as explained in [*Cooke v. United States*, 267 U.S. 517, 45 S.Ct. 390, 69 L.Ed. 767 (1925)] requires that one charged with contempt of court be advised of the charges against him, have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in his behalf, either by way of defense or explanation. The narrow exception to these due process requirements includes only charges of misconduct, in open court, in the presence of the judge, which disturbs the court's business, *where all of the essential elements of the misconduct are under the eye of the court, are actually observed by the court,* and where immediate punishment is essential to prevent 'demoralization of the court's authority * * * before the public.' *If some essential elements of the offense are not personally observed by the judge, so that he must depend upon statements made by others for his knowledge about these essential elements, due process requires, according to the Cooke case, that the accused be accorded notice and a fair hearing as above set out.*

*Edwards*, 703 A.2d at 1059 (quoting *In re Oliver*, 333 U.S. at 275, 68 S.Ct. at 508–09, 92 L.Ed. at 695. (emphasis added.))

While Pennsylvania courts have departed from the "observed by" or "in front of" requirement for summary hearings of direct contempt, they have done so only in

7. *See also Commonwealth v. Garrison*, 478 Pa. 356, 386 A.2d 971, 976 (1978):

When acting to uphold its authority, however, a court must use the least possible power and should first consider less severe remedies such as civil contempt before imposing summary criminal contempt. The judge should resort to criminal sanctions only after he determines, for good reason, that the civil remedy would be inappropriate.... [A]ppellate courts have reversed convictions for summary criminal contempt where a cautionary instruction to the jury would have restored order or negated any ill effects of counsel's behavior, where civil or nonsummary criminal contempt would have served the trial court's purpose, or where some other effective sanction was available.
(internal citations omitted).

very narrow circumstances. *Id.* Specifically, when a witness states that he will not testify, the Pennsylvania Supreme Court has held that the trial court is not required physically to put the witness on the stand, ask him questions, and have his silence noted on the record; it is sufficient that the witness state that, if placed on the stand, he would refuse to respond. *See Commonwealth v. Crawford*, 466 Pa. 269, 352 A.2d 52, 53 (1976) (contemnor stated he would not testify, though he did not actually refuse to answer questions in open court).[8] In such circumstances, the record reflects that the trial judge has direct knowledge of the elements of contempt.

In extending that line of reasoning, the Pennsylvania Supreme Court similarly has held that an appellant who does not appear in court, as ordered, can be held in direct criminal contempt. *See Commonwealth v. Ferrara*, 487 Pa. 392, 409 A.2d 407, 411 (1979) (appellants failed to appear for either arraignment or trial; when brought in under warrant for arrest they were held in direct criminal contempt). The trial court in *Ferrara* questioned the appellants, who returned to court after a warrant was issued for their arrest, on the record, and found that the appellants willfully chose not to attend their court date. *Id.* at 409. Thus, all of the facts necessary to establish the elements of contempt were directly witnessed by the trial judge and placed on the record.[9] Herein lies the distinction

between this case and *Crawford, Brown, and Ferrara, supra,* where the Court has departed from the "in front of the judge" requirement; the judges in that line of cases had personal knowledge of the contempts and placed that knowledge on the record.

 Instantly, confining our review to an examination of the record alone, as is required by *Jackson, supra,* there is no indication that the trial judge personally observed Appellants' specific actions. Instead, it appears that the trial judge relied substantially on the court crier's testimony to determine the identities of Appellants and the essential elements of Appellants' offenses.

COURT CRIER: ... I pushed the woman who was being attacked to the right of that pillar. At which time this woman here can [*sic*] around the pillar.

THE COURT: Can you please describe—

THE WITNESS: I'm sorry. The woman in the white sweatshirt.

\* \* \*

COURT CRIER: ... At the same time other things were going on. I don't know who the people were. Somebody was trying to hit somebody with a cane. And some other people were throwing punches. And I just can't identify more than those two people and the lady in

---

**8.** It is unclear whether the witness in *Crawford* was placed under oath. *See also Commonwealth v. Brown*, 424 Pa.Super. 333, 622 A.2d 946, 949 (1993) (contemnor's refusal to testify took place "in open court, on the record.").

**9.** "We have held also that in proceedings before a grand jury, a witness' refusal to testify is considered as taking place in the presence of the court. *See Rosenberg Appeal*, 186 Pa.Super. 509, 142 A.2d 449 (1958). Conversely, we have noted that the mere presence

of an officer of the court during a contemptuous act does not make that act a direct contempt. *See Altemose Const. Co. v. Building and Const. Trades Council of Philadelphia*, 449 Pa. 194, 296 A.2d 504 (1972) (acts committed at construction site do not constitute direct criminal contempt even though sheriff was present), *cert. denied*, 411 U.S. 932, 93 S.Ct. 1901, 36 L.Ed.2d 392 (1973)."

*Edwards*, 703 A.2d at 1059 (citing *Commonwealth v. Brown*, 424 Pa.Super. 333, 622 A.2d 946, 948 (1993)).

the tan jacket, who I thought started a lot of the situation.

THE COURT: The lady in the tan jacket, do you see her here?

THE WITNESS: She is the lady back there, Your Honor, in the third—putting her hand up in the air, You Honor, right now. In fact, we even had communications outside the courtroom.

THE COURT: All right. Do you want to come in here, ma'am?

Sit down in the table between those two ladies.

All right. Go ahead. The lady in the tan was doing what?

N.T. at 5–12.

The only observations of the trial judge that are actually of record that describe the fight in the gallery are general and vague:

THE COURT: When the court officer went out to get the mother, a fight broke out in the gallery involving numerous people in which the court officer got stuck in the middle and his arm was hit during the proceeding. He can tell us more about what happened.

S.H.N.T. at 5.

Thus, the record does not show that the judge personally observed the essential elements of each Appellant's contempt offenses. The judge relied substantially upon the statement made by the court crier, as a witness to the events, for the judge's knowledge about Appellants' identities and actions. We find that the "in the presence of the court" requirement of 42 Pa.C.S.A. § 4132(3) was not established beyond a reasonable doubt. Because the trial court felt it necessary to take evidence from a witness, the court crier, the proceeding was not and should not have been deemed a summary hearing. The trial court abused its discretion in holding what it referred to as a summary hearing

that, as a matter of law, violated Appellants' due process rights.

Appellants should have been permitted to cross-examine the court crier, and to present their own witnesses, in an adversary hearing with full due process protections. *Edwards*, 703 A.2d at 1059. (citing *In re Oliver*, 333 U.S. at 275, 68 S.Ct. 499). Because they were denied these rights, we remand for a new contempt hearing in which Appellants are "advised of the charges against [them], have a reasonable opportunity to meet them by way of defense or explanation, have the right to be represented by counsel, and have a chance to testify and call other witnesses in [their] behalf, either by way of defense or explanation." *In re Oliver*, 333 U.S. at 275, 68 S.Ct. 499.

Because we decide that the trial court held a contempt hearing that violated Appellants' due process rights, Appellants' third issue, which pertains to sentencing, is moot.

The same is true of Appellants' first issue. Nonetheless, on this point, more explanation is required. Despite our determination that the process afforded Appellants was constitutionally deficient, we must nonetheless consider Appellants' challenge to the sufficiency of the evidence issue. If this challenge is meritorious, not only would we be compelled to vacate the convictions, but any further proceedings for criminal contempt would be barred by double jeopardy principles. We find, however, that Appellants' challenge to the sufficiency of the evidence fails.

▉▉▉▉ Appellants challenge the adequacy of the evidence offered at their contempt proceeding to establish their identities and to attribute to each of them acts constituting contempt. Appellants rely upon the principles attendant to appellate review of the evidence established at a

summary contempt hearing. Where such a hearing occurs, this Court is bound to review only the evidence dictated on the record by the trial court, as a summary hearing by definition entails only evidence observed first-hand from the bench. *Jackson, supra.* Above, however, we determined that what occurred in this case was a non-summary hearing because the trial judge was unable to make the findings necessary to support his conclusions solely based upon his own observations. Instead, the court appeared to require eyewitness testimony to establish or to help establish the contumacious acts and the identities of the respective actors. We must consider all of the evidence presented at the hearing, including the court crier's testimony. Although we agree that the evidence establishing the Appellants' identities and allegedly contumacious acts was poorly developed, we nonetheless conclude that the evidence presented was, as averred by the court in its Rule 1925(a) opinion, sufficient to enable a reasonable fact-finder to find each Appellant guilty of direct criminal contempt beyond a reasonable doubt. This conclusion, however, only returns us to our determination that Appellants were denied due process relative to the charges and proceedings below.

Judgment of sentence vacated. Remanded for proceedings consistent with this opinion. Jurisdiction relinquished.

GANTMAN, J., concurs in the result.