J-S98001-23

2023 PA Super 156

| | | |
|---|---|---|
| IN RE: BRENDA DAVIS | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: BRENDA DAVIS | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 887 WDA 2022 |

Appeal from the Judgment of Sentence Entered August 4, 2022
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-MD-0000898-2021

BEFORE: PANELLA, P.J., LAZARUS, J., and STABILE, J.

OPINION PER CURIAM:                             **FILED: August 18, 2023**

Brenda Davis, Clerk of Courts of Washington County, Pennsylvania, appeals from the decision of the Court of Common Pleas of Washington County, 27th Judicial District, which on August 4, 2022, found her guilty of Direct Criminal Contempt and sentenced her to "pay costs of prosecution and to pay a fine of $5,000.00" and furthermore, "to be incarcerated in the Washington County correctional Facility for no less than 15 days to no more than six (6) months."[1]

The Honorable John F. DiSalle, President Judge of Washington County filed an Opinion pursuant to Pa.R.A.P. 1925(a) on April 6, 2023. Upon careful examination of the certified record, we conclude that the trial court's 22-page

---

[1] Order of Court, 11-4-2022. All of our references are to the certified record.

opinion thoroughly and comprehensively addresses all of the Appellant's arguments. Accordingly, we affirm on the basis of the well-reasoned April 6, 2023 opinion of President Judge DiSalle.

In its opinion, the trial court fully and adequately sets forth the relevant facts and procedural history of this case, all of which are supported in the record. Therefore, we have no reason to restate the unpleasant series of events which occurred on November 24, 2021, which often necessarily refers to the outrageous conduct exhibited by Clerk of Court Davis on that day.

Appellant presents[2] the following issues for our review:

1. Whether the Trial Court erred in finding Appellant guilty of Direct Criminal Contempt, pursuant to 42 Pa. C.S. § 4132, as Appellant was never scheduled or notified to appear before President Judge DiSalle on the date in question. Rather the Deputy Sheriffs presented an Order, made their own determination of contempt and manually forced Appellant within earshot of the President Judge. Once within earshot, the Trial Judge would later testify that he was disrupted by noise emanating from Appellant. This is clearly not the spirit or intent of the Criminal Contempt Statute.

2. Whether it was error that President Judge DiSalle found Appellant Guilty of Criminal Contempt, "an ungraded Misdemeanor." Appellant charges error with the finding of Direct Criminal Contempt, further compounded by the Trial Court grading said conviction as an "ungraded misdemeanor." A violation of 42 Pa. C.S. § 4132 is merely a summary offense, punishable by no more than 90 days, with a maximum of fifteen (15) days of incarceration. The Trial Court's sentence is mis-graded and therefore illegal.

---

[2] We cite to the Appellant's concise statement of matters complained of on appeal to state the issues before the Superior Court because, in violation of Pa.R.A.P. No. 2111(a)(4), the Appellant's Brief does not contain a statement of the questions involved. In further violation of the appellate rules, the Appellant did not append to her brief the aforesaid statement. ***See*** Pa.R.A.P. No. 2111(d).

3. Appellant raises further error with the sentence of President Judge DiSalle, in that Appellant was sentenced to a period of incarceration for no less than fifteen (15) days and no more than six (6) months in the Washington County Correctional Facility. Upon completion of her minimum sentence, Appellant was further ordered to be paroled to the supervision of the Washington County Probation Office to complete the remainder of her sentence. In addition, a fine of $ 5,000.00 was levied against Appellant. It is Appellant's position that a maximum fine of $ 100 was applicable to a conviction of 42 Pa. C.S. § 4132, pursuant to 42 Pa. C.S. § 4133.

Concise Statement, 9/8/2022, at 1-2.

Criminal contempt occurs in two ways: direct and indirect. In general, contempt is "direct when committed in the court's presence and indirect when committed beyond its presence." *Crozer-Chester Medical Center v. Moran*, 560 A.2d 133, 136 (Pa. 1989). Notwithstanding the inherent power in the courts to maintain order and decorum when in session, our legislature codified direct criminal contempt in 42 Pa.C.S. § 4132, which provides contempt power to the trial court and authorizes the court to penalize:

(1) The official misconduct of the officers of such courts respectively.

(1.1) The willful failure of the officers of such courts to disclose a person's complete criminal history record information when requested.

(2) Disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court.

(3) The misbehavior of any person in the presence of the court, thereby obstructing the administration of justice.

42 Pa.C.S. § 4132. With respect to Appellant's first issue, to sustain a conviction for direct criminal contempt under subdivision (3), "the following elements must be established beyond a reasonable doubt: 1) misconduct; 2) in the presence of the court; 3) committed with the intent to obstruct the proceedings; 4) that obstructs the administration of justice." *Commonwealth v. Perkins*, 292 A.3d 1144, 1147 (Pa. Super. 2023).

In Pennsylvania, our Supreme court has long upheld a trial court's power to "maintain courtroom authority" by the imposition of summary punishment for contempt in appropriate cases. *See Commonwealth v. Moody*, 125 A.3d 1, 8 (Pa. 2015); *Behr v. Behr*, 695 A.2d 776, 778 (Pa. 1997).

> [A] summary proceeding to protect the orderly administration of justice is perfectly proper[.] ... The court must be able to control those appearing before it, and must be able to use its power summarily to avoid interference with the principal matter before the court." *Commonwealth v. Africa*, 466 Pa. 603, 353 A.2d 855, 865 (1976) (plurality). "Summary proceedings for contempt of court are those in which the adjudication omits the usual steps of 'the issuance of process, service of complaint and answer, holding hearings, taking evidence, listening to arguments, awaiting briefs, submission of findings, and all that goes with a conventional court trial." *Commonwealth v. Stevenson*, 482 Pa. 76, 393 A.2d 386, 392 (1978) (quoting *Sacher v. United States*, 343 U.S. 1, 9, 72 S.Ct. 451, 96 L.Ed. 717 (1952)). Thus, "the summary contempt power has been upheld against due process attacks [.]" *Id.* (citations omitted). Respecting due process, this Court has candidly acknowledged summary punishment for criminal contempt is a "drastic departure from our traditional view of due process[.]" *Commonwealth v. Marcone*, 487 Pa. 572, 410 A.2d 759, 763 (1980). However, *Marcone* highlighted the justification for that departure, which was well articulated by Chief Justice Taft in *Cooke*:
>
> > We think the distinction [between contempt merely "in the presence of the court" and that which takes place "in open

court" or "in the face of the court," thereby justifying the departure from the traditional view of due process requirements,] finds its reason not any more in the ability of the judge to see and hear what happens in the open court than in the danger that, unless such an open threat to the orderly procedure of the court and such a flagrant defiance of the person and presence of the judge before the public in the very hallowed place of justice ... is not instantly suppressed and punished, demoralization of the court's authority will follow. Punishment without issue or trial was so contrary to the usual and ordinarily indispensable hearing before judgment constituting due process that the assumption that the court saw everything that went on in open court was required to justify the exception; but the need for immediate penal vindication of the dignity of the court created it.

*Id.* [quoting *Cooke v. United States*, 267 U.S. 517, 534, 536, 45 S.Ct. 390 (1925) (internal quotation marks omitted)].

This Court has noted the inherent authority of courts to impose summary punishment for contempt is a power incidental to the grant of judicial power under Article V of the Pennsylvania Constitution. *See id.* (citations omitted); *see also Commonwealth v. McMullen*, 599 Pa. 435, 961 A.2d 842, 849 (2008) (citation omitted). Additionally, the General Assembly has addressed the power in enacting the Judicial Code. *See, e.g.*, 42 Pa.C.S. § 4132(3) ("The power of the several courts of this Commonwealth ... to impose summary punishments for contempts of court shall be restricted to ... cases ... [where, *inter alia,* t]he misbehavior of any person in the presence of the court ... obstruct[s] the administration of justice."). The Judicial Code provides the summary punishment of commitment for such contempt is only available where the misbehavior takes place "in open court." *Id.,* § 4133.

Further, the power to impose summary punishment for direct criminal contempt is not applicable to minor misconduct, even in open court, but instead is available only for " 'such conduct as created an open threat to the orderly procedure of the court and such flagrant defiance of the person and presence of the judge before the public that, if not instantly suppressed and punished, demoralization of the court's authority will follow.' " *Commonwealth v. Garrison*, 478 Pa. 356, 386 A.2d 971, 976

- 5 -

(1978) (plurality) (quoting **Jessup v. Clark**, 490 F.2d 1068, 1071 (3d Cir.1973)). "Only in such circumstances may a court subject a contemn[o]r to punishment without the procedural protections otherwise accorded [to] the criminally accused." *Id.* In sum, courts have inherent power and statutory authority to impose summary punishment for direct criminal contempt for willful misconduct that occurs in the presence of the court and obstructs its fair and orderly process. *See id.,* at 975 (citations omitted); **accord In re Martorano**, 464 Pa. 66, 346 A.2d 22, 27 (1975) (citations omitted).

**Commonwealth v. Moody**, 125 A.3d 1, 8-9 (Pa. 2015)

In this case, the trial court gave the Appellant a full opportunity to be heard and to be represented by counsel. Appellant's overarching issue involves the interpretation of the phrase, "in the presence of the court." Appellant's Brief at 11. Appellant argues that the trial court improperly expanded the definition to include her conduct on November 24, 2021, which occurred outside the courtroom. **See id**. According to Appellant, she was "in an office one floor below the Appellee's courtroom and at the opposite side of the courthouse from the Appellee's Courtroom." **Id**. at 11-12.[3] She contends that since her conduct was outside the presence of the court, the evidence was insufficient to convict her of direct criminal contempt. **See id**. We disagree and find that the Appellant's argument is belied by the record.

As stated above, we have no desire to revisit Appellant's bizarre conduct on the day in question, but a brief reference to the record is necessary to

---

[3] The Appellant inappropriately refers to the trial court as the "Appellee" in her brief.

dispel Appellant's argument. Although the Appellant had been ordered to appear before the trial court, and sheriff deputies had been sent to escort her into the courtroom, and the trial judge had been seated on the bench waiting for the Appellant to appear, she refused to enter the courtroom. The trial judge could hear her screaming outside the courtroom. Transcript, 8-4-2023 at 10. "I could hear her screaming out, along with her associates, out in the hallway, while I was waiting to address her for this contempt." *Id*. at 13.

Our Supreme Court has recognized that misconduct occurs in the presence of the court if the court itself witnesses the conduct *or* if the conduct occurs outside the courtroom but so near thereto that it obstructs the administration of justice. *See Commonwealth v. Moody*, 125 A.3d 1, 12 (Pa. 2015). Here, the trial court, while waiting for the Appellant to appear, heard the Appellant causing a commotion in the hallway, while at the same time resisting the trial court's direction to appear. Under the facts of this case, there is no question that the Appellant's conduct obstructed the administration of justice, and we need look no further as to whether her belligerent actions satisfied this element of direct criminal contempt. As the trial court's opinion indicates, instead of appropriately utilizing court processes to challenge duly enacted court rules and orders to transfer juvenile delinquency and dependency cases from her office to the Juvenile Probation Office of Washington County, Appellant blazingly took matters into her own hands in defiance of these authorities.

This Court's standard for reviewing a finding of direct criminal contempt is an abuse of discretion. *See id*. at 12; *Commonwealth v. Robinson*, 166 A.3d 1272, 1277 (Pa. Super. 2017). After a thorough review of the certified record before us on appeal, the briefs of the parties, the applicable law, and the well-reasoned opinion of the trial court, we conclude that the trial court properly and correctly addressed the issues raised by Appellant on appeal. We therefore adopt the trial court's opinion of April 6, 2023, as our own and incorporate it in this Opinion.

Accordingly, the trial court's August 4, 2022 judgment of sentence is affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/18/2023

- 8 -

IN THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

IN RE:                            )
                                    )
         BRENDA DAVIS,             )     No.     887 WDA 2022
         CLERK OF COURTS         )              CP-63-MD-000898-2021

## Pa. R. A. P. 1925(a) OPINION

The matter comes before the Superior Court on the appeal of the Brenda Davis, the duly elected Clerk of Courts for the Twenty-seventh Judicial District, Washington County (hereinafter referred to as the "Contemnor"), from the judgment of sentence entered following a finding of direct criminal contempt in violation of 42 Pa. Con. Stat. Ann. § 4132, entered by the lower court on August 4, 2022.

### Factual Background

In order to place the contempt proceedings and the Contemnor's behavior and claims in context, a review of the events leading up to the finding of contempt is required. On September 2, 2021, the Contemnor filed in her office and with the Prothonotary of Washington County, a document which she entitled "Waiver of Functions" pursuant to 42 Pa. Con. Stat. Ann. § 2756. In her "Waiver," the Contemnor declared her intention to waive and relinquish various responsibilities of the office of the Clerk of Courts, including, *inter alia*, the filing of DL-26 forms with the Pennsylvania Department of Transportation and the keeping of records and docketing functions for juvenile dependency and delinquency cases. By order of court dated September 8, 2021, the Waiver was subsequently stayed, and, thereafter, returned by the Administrative Office of Pennsylvania Courts ("AOPC") to the Contemnor.[1] An examination of the Waiver showed that

---

[1] In the Waiver, the Contemnor attempted to relinquish more duties than permitted by statute. The AOPC returned the Waiver because the Contemnor asserted that the Waiver had been executed in conjunction with the court of common pleas, which was false.

1

it was practically unintelligible and signed by the Contemnor as if she was a judge, but significantly for the instant matter, included a stated intention to cede responsibilities for juvenile court filings. Following the entry of the stay, the court arranged a meeting with the Contemnor and her solicitor, as well as the District Court Administrator, on September 17, 2021, in an attempt to resolve issues concerning the responsibility and effective administration of the office of the Clerk of Courts. That meeting was ultimately unfruitful. On September 29, 2021, as she had promised during the meeting, the Contemnor filed an "Amended Waiver of Functions," which incorporated the original "Waiver" stating her intention to cede responsibility for administering juvenile court records.

On October 7, 2021, the statewide Juvenile Court Procedural Rules committee approved two proposed local rules of juvenile procedure for the 27th District, Rules 120 and 1120. Both rules provided that for the purposes of juvenile delinquency and dependency case records and filings, the "clerk of courts" would be the Juvenile Probation Office of Washington County. Thereafter, the court filed its Administrative Order adopting the rules on October 15, 2021, along with a second Administrative Order which provided as follows:

> [T]he transition of duties from the Clerk of Courts to the Juvenile Probation Office shall occur at the direction of the Court and its designees.
>
> [...]
>
> To effectuate an orderly transition of duties and to safeguard the records of juvenile dependency and delinquency matters, the Court finds it necessary to exercise authority pursuant to Pennsylvania Rule of Judicial Administration 103...Accordingly, the transition of duties may occur earlier than the effective date of Rules L-120 and L-1120, as determined by the Court. The Clerk of Courts shall not cease to carry out any duties, or otherwise make changes to the daily functions involving juvenile matters, without permission of the Court or its designees.

The Administrative Orders and the two local rules of juvenile procedure were served on the Contemnor on October 15, 2021. The local rules were published in the *Pennsylvania Bulletin*, Vol. 51, No. 44, on October 30, 2021, to be effective on Monday, November 29, 2021.

2

The Chief Juvenile Probation Officer emailed the Contemnor on two separate occasions, October 28, 2021 and November 5, 2021, to attempt to discuss the transfer of juvenile filings and duties. Exhibits G and H. The Contemnor never responded to the emails. On November 5, 2021, the same day as the second email, the Contemnor filed four *pro se* notices of appeal in the Commonwealth Court challenging various administrative actions undertaken by the court, including the Administrative Orders in question and the transfer of the juvenile records. Transcript of Hearing, Aug. 4, 2022, p. 9. On November 19, 2021, the District Court Administrator emailed the Contemnor and respectfully requested that she respond to the Chief Juvenile Probation Officer to discuss the transfer of the juvenile records, acknowledging the appeals but noting that there was no stay requested or entered in conjunction with the appeals. Exhibit J.[2] Tellingly, the Contemnor responded to the requests for cooperation with a foreshadowing of her contumacious behavior in this matter:

> I am an independent elected official and as a county officer I have 1620 rights[3] which I am choosing to utilize. I have tried to work with you, the courts, and the commissioners[;] unfortunately[,] all attempts have been met with resistance.
>
> Yes, I have filed several Commonwealth appeals.
>
> If you continue to persist, threaten me with contempt charges, or use any other intimidation factors to remove my staff, files, or statutory duties without a

---

[2] An administrative order entered by a President Judge pursuant to 42 Pa. Con. Stat. Ann. § 323 is plainly not an appealable order pursuant to case law, and, by extension, not entitled to an automatic supersedeas. *See, e.g., In re Domitrovich*, 257 A.3d 702 (Pa. 2021). Such an order does not involve claims or parties, nor is it a final or collateral order arising from a case - there is no case or determination to challenge by appeal. The appropriate course to challenge an administrative order is a writ of prohibition with the Supreme Court of Pennsylvania. *In re Domitrovich*, 257 A.3d at 712-714.

[3] The "1620 rights" referenced by the Contemnor is the provision of the County Code that prohibits a board of county commissioners from infringing on the authority of a judge or county officer to hire, fire, and supervise employees. 16 P.S. § 1620. Contemnor has repeatedly demonstrated her mistaken belief that section 1620 of the County Code provides her with autonomy from the County government and the Court of Common Pleas. It was nonsensical for the Contemnor to invoke that statutory provision in response to validly promulgated local rules of juvenile procedure. However, in this and other contexts, the Contemnor has repeatedly asserted that this statute essentially permits her to act at her pleasure. It does not.

3

RR082

Commonwealth Court Order[,] **it will be met with opposition**. The courts and commissioners need to be patient and let the Commonwealth Court work this out.

Until I receive a Court Order from the Commonwealth[,] **nothing is being removed from the Clerk of Courts['] office**.

Exhibit J (emphasis added). Of course, at no time did the Chief of Juvenile Probation or the District Court Administrator extend any threats or intimidation in any communications with the Contemnor, rather, they offered polite entreaties to engage her with reality. In accordance with the Administrative Order, as of November 29, 2021, the Monday following the Thanksgiving holiday, the responsibilities for maintaining the dockets and records of juvenile delinquency and dependency cases would no longer rest with the office of the Contemnor; instead, those duties were set to become those of the Juvenile Probation Office. This transfer of duties and responsibility for the juvenile files was not arbitrary, and would require the marshalling of services and assets: it involved rulemaking, weeks of work with the AOPC to re-task the CPCMS, staff allocation, and the physical transfer of thousands of records from one location within the courthouse to another.

At this point, the Contemnor had made it abundantly clear that she would not be cooperating in carrying out the official business of the court that she was elected to serve. After consultation with the Juvenile Probation Chief and the District Court Administrator, the court determined that the last possible day to effectuate a transfer of the physical files was November 24, 2021, the last business day before the Thanksgiving holiday. The local rules were published and effective on Monday, November 29, 2021 (both in the *Pennsylvania Bulletin* and to the Bar Association Journal) and CPCMS was scheduled to transfer to the Juvenile Probation office on that day as well. The court met with the Sheriff on November 23, 2021, to determine the best course of handling the transfer of the physical files. Based on the Contemnor's stated intentions

4

and behavior, there was concern that she would refuse to cooperate, and refuse to follow the court order. Accordingly, the Sheriff requested that if an order of court was issued compelling her assistance, that said order could be enforced and provide the Sheriff's department with the authority to detain and attach her if she refused to comply.

On November 23, 2021, the Court issued the following Order:

[T]he Chief Juvenile Probation Officer, and any necessary court staff, shall enter the office of the Clerk of Courts to take custody of all juvenile court files for juvenile delinquency and dependency cases from the Clerk of Courts. In accordance with Local Rules L-120 and L-1120, the Juvenile Probation Office is the designated custodian for the juvenile court files.

The Chief Juvenile Probation Officer shall ensure that a notation is made of each juvenile court file transferred from the care of the Clerk of Courts to the Juvenile Probation Office. The Clerk of Courts, and her staff, shall cooperate in the orderly transfer of files.

The Sheriff, or his designee, is DIRECTED to enforce this Order. If the Clerk of Courts, or a member of her staff, refuses or otherwise fails to comply with this Order, the Sheriff shall immediately attach and detain the individual pending proceedings for contempt pursuant to 42 Pa. C.S.A. § 4101, *et seq.*, before the undersigned.

Exhibit K.

On November 24, 2021, the Chief Juvenile Probation Officer and District Court Administrator, accompanied by two deputy sheriffs, served the Contemnor with the 11/23/21 Order. Transcript of Hrg., Nov. 24, 2021, pp. 3-4. They attempted to speak with the Contemnor concerning the Order; however, the Contemnor refused to discuss the Order or *even read it*, and instead began filming everyone on her cellphone. *Id.* at p. 14.[4] The Contemnor flatly refused to comply with the Order, declaring that she "was an elected official" with "1620 rights" and did not "have to follow the order." *Id.* at p. 4. The Contemnor argued with the deputies and continued

---

[4] Based on the record, including the courthouse surveillance camera footage, it appears that the Contemnor first took the time to even read the Order while in the elevator leading to the undersigned's courtroom. *Id.* at p. 11; Exhibit M of August 4, 2022 hearing.

5

her noncompliance with the Order. *Id.* at pp. 4-5. At that point, the Contemnor ran around the transaction counter of her office and slammed shut the door to the vault that held the juvenile court records, locking it in the process.[5] *Id.* at p. 5. This was a conscious, deliberate attempt to prevent the transfer of the juvenile court records. The deputies then "attempted to place [the Contemnor] in handcuffs," but she resisted, struggling and fighting with the deputies. *Id.* at p. 15. Eventually the Contemnor was not handcuffed because she "complained of a back injury." *Id.*

Following the fracas in her office, the Contemnor was escorted to the undersigned's courtroom by deputy sheriffs. *Id.* During this time, one of the deputies called for medical assistance for the Contemnor, as a result of her complaints, and emergency medical technicians arrived thereafter. *Id.* at pp. 15-16. By this time, the undersigned was on the bench, waiting for the Contemnor to appear before the court. Transcript of Hrg. Aug. 4, 2022, at p. 10. However, the Contemnor never appeared before the court as she refused to enter the courtroom. At her sentencing, the court made the following finding: the court "could hear [the Contemnor] screaming out, along with her associates, out in the hallway [outside the courtroom], while [President Judge DiSalle] was waiting to address [the Contemnor] for this contempt." *Id.* at p. 40. The undersigned left the bench and went into an anteroom to confer with the Chief Deputy Sheriff and others. At that point, the court's law clerk reported that he had gone out – at the court's direction – to tell the Contemnor to be seated in the courtroom. The Contemnor refused. She received medical attention for complaints of back pain, and, at some point, "heart palpitations." Transcript of Hrg., Nov. 24, 2021, at pp. 10-13. The paramedic reported to the undersigned that the Contemnor's heart rate was slightly elevated, but otherwise her vital signs were normal. *Id.* at 12.

---

[5] Many offices located within the 120-year-old courthouse still contain vaults with combination locks. Although it has been decades since these vaults were used to contain money or other values, the vaults are used to store files, as had been the case here, or office supplies and other sundries. Only the Contemnor and her deputy had access to the combination to the vault.

6

On November 24, 2021, following Contemnor's refusal to enter the courtroom and her unauthorized departure from the courthouse, the court took testimony on the record in open court to document the events of the day, including the testimony of multiple deputy sheriffs who were involved. The court found all of the testimony of the deputy sheriffs to be credible, but particularly noted the observations of Deputy Paul Rock, a long-serving member of the Sheriff's Department with significant court-related experience, who reported his involvement with the Contemnor in the hallways and in the ground-level basement of the courthouse:

> But she could walk, she was walking, you know. She walked away from us numerous times. She ended up getting down to the basement [of the courthouse] [near the exit].
>
> [...]
>
> At that time, [the Contemnor], you know she was still, like, pushing away, trying to get out the door, you know...You know, one minute she wanted the medics to be there, the next minute she didn't. In my experience, she just wanted to get out of the courthouse. You know, every chance she got, she was walking normal, you know. But you know, we did get her medical attention, but she really, in my eyes, didn't give them a chance to check her out too much.

*Id.* at pp. 18-19. Deputy Sheriff Edward Schell also noted that the Contemnor, after being attended to by the medics, "got up on her feet and walked out of the courthouse herself." *Id.* at p. 17. The courthouse surveillance footage shows interesting information too, such as the Contemnor jumping out of a wheelchair and scurrying out of the elevator upon seeing that it was headed for the courtroom floor and not the basement and exit. Exhibit M. The footage also shows that the Contemnor walked downstairs from the courtroom to her office to retrieve belongings, and then put on her coat and hat, indicating behavior of someone who is leaving and not coming up from their office (one floor down) to the courtroom. All of this indicated that rather than face the consequences of her actions, the Contemnor "absconded from the courthouse." Order of Sentence, No. MD-898-2021, Aug. 5, 2022.

7

On November 24, 2021, the Contemnor filed a fifth appeal with the Commonwealth Court, challenging the adoption of the aforementioned local rules of juvenile procedure, a sixth appeal on November 30, 2021, and a seventh appeal on November 30, 2021.[6] All seven appeals were quashed on February 4, 2022.

Following the Contemnor leaving the courthouse on November 24, 2021 (again, without the permission of the Court), the continuation of the contempt proceeding was scheduled for Monday, November 29, 2021. That proceeding was rescheduled for December 6, 2021, at the request of the Sheriff's Department, which urged for additional time to arrange for adequate security for the proceeding, and to avoid further disruption of other court proceedings. In the meantime, the Contemnor filed for a Petition for Emergency Stay in the Superior Court, which was denied on December 2, 2021. However, on the afternoon of Friday, December 3, 2021, the Commonwealth Court granted a second request from the Contemnor to stay the contempt proceedings. The stay was lifted on February 4, 2022, as the Commonwealth Court found that because a punishment had not yet been imposed on the Contemnor, the appeal was interlocutory and was dismissed. *See* Docket No. 1332 CD 2021, Order of February 4, 2022.

The resumption of the contempt proceeding was then scheduled for February 28, 2022. On February 22, 2022, the Contemnor filed an Application for Writ of Prohibition and Emergency Stay with the Supreme Court.[7] In light of the Writ of Prohibition and upon advice of the AOPC's legal department, the Court continued the contempt proceeding generally, pending disposition of the Writ of Prohibition. The Supreme Court denied the Writ by *per curiam* order on June 23, 2022. Subsequently, the contempt proceeding was scheduled to resume on August 4, 2022, in order to

---

[6] The Commonwealth Court docket numbers were: Nos. 1222 CD 2021; 1223 CD 2021; 1224 CD 2021; 1225 CD 2021; 1332 CD 2021; 1333 CD 2021; and 1334 CD 2021.

[7] The Supreme Court docket number was No. 5 WM 2022.

8

RR087

allow time for the return of the record and for the Contemnor to have adequate time to secure counsel.[8]

Following the hearing on August 4, 2022, at which Contemnor was present and represented by her current counsel, the court found the Contemnor guilty of direct criminal contempt in violation of 42 Pa. Con. Stat. Ann. § 4132, as a result of her behavior:

> Refusing to follow the Court's Order on November 23, 2021;
> Locking the vault, restricting access to the Juvenile files;
> Refusing to submit to the Deputies;
> Refusing to come into the courtroom to be addressed by the Court;
> and
> Engaging in misbehavior immediately outside the courtroom, which created such a disruption that it spilled over three floors of the courthouse until [the Contemnor] absconded from the courthouse.

Order of Sentence dated August 5, 2021, No. MD-898-2021. The Contemnor was then sentenced to a term of imprisonment of no less than fifteen (15) days to no more than six (6) months, a $5,000.00 fine, and to pay the costs of prosecution. *Id.* Upon the completion of her minimum sentence, the Contemnor was then paroled for the balance of the six (6) months, to the supervision of the Adult Probation Office. A timely appeal was filed on August 8, 2022.

## Issues on Appeal

In her concise statement of matters complained of on appeal, the Contemnor alleges the following errors:

1. Whether the Trial Court erred in finding Appellant guilty of Direct Criminal Contempt, pursuant to 42 Pa. C.S. § 4132, as Appellant was never scheduled or notified to appear before President Judge DiSalle on the date in question. Rather the Deputy Sheriffs presented an Order, made their own determination of contempt and manually forced Appellant within earshot of the President Judge. Once within earshot, the Trial Judge

---

[8] Because of the length of time between the contumacious acts and the levy of the punishment, the court decided to provide the Contemnor with the opportunity to have counsel present and to be heard at the proceedings. Had the Contemnor not absconded from the courthouse on November 24, 2021, to avoid facing the consequences of her deplorable behavior, she would not have been entitled to either of those due process protections.

9

would later testify that he was disrupted by noise emanating from Appellant. This is clearly not the spirit or intent of the Criminal Contempt Statute.

2. Whether it was error that President Judge DiSalle found Appellant Guilty of Criminal Contempt, "an ungraded Misdemeanor." Appellant charges error with the finding of Direct Criminal Contempt, further compounded by the Trial Court grading said conviction as an "ungraded misdemeanor." A violation of 42 Pa. C.S. § 4132 is merely a summary offense, punishable by no more than 90 days, with a maximum of fifteen (15) days of incarceration. The Trial Court's sentence is [sic] mis-graded and therefore illegal.

3. Appellant raises further error with the sentence of President Judge DiSalle, in that Appellant was sentenced to a period of incarceration for no less than fifteen (15) days and no more than six (6) months in the Washington County Correctional Facility. Upon completion of her minimum sentence, Appellant was further ordered to be paroled to the supervision of the Washington County Probation Office to complete the remainder of her sentence. In addition, a fine of $5,000.00 was levied against Appellant. It is Appellant's position that a maximum fine of $100 was applicable to a conviction of 42 Pa. C.S. § 4132, pursuant to 42 Pa. C.S. § 4133.

## Legal Analysis

It is well-settled that the standard of review for an order finding an individual in contempt is "extremely narrow." *Estate of Baehr*, 596 A.2d 803, 805 (Pa.Super.1991), *appeal dismissed*, 618 A.2d 944 (Pa. 1993). Upon review, the appellate court places

> great reliance on the discretion of the trial judge. Each court is the exclusive judge of contempts against its process, and on appeal its actions will be reversed only when a plain abuse of discretion occurs. In cases of direct criminal contempt, that is, where the contumacious act is committed in the presence of the court and disrupts the administration of justice, an appellate court is confined to an examination of the record to determine if the facts support the trial court's decision.

*Commonwealth v. Williams*, 753 A.2d 856, 861 (Pa.Super.2000) (citing *Commonwealth v. Jackson*, 532 A.2d 28, 31-32 (Pa.Super.1987)); *see also Commonwealth v. Diaz*, 191 A.3d 850, 864 (Pa.Super.2018) (citing *Commonwealth v. Bowden*, 838 A.2d 740 (Pa. 2003)). "Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied." *Diaz*, 191 A.3d at 864 (quoting *Bowden*, 838 A.2d at 762).

10

The first two allegations of error are centered on the statute governing direct contempt. That statute, entitled "Attachment and summary punishment for contempts," states in its entirety:

The power of the several courts of this Commonwealth to issue attachments and to impose summary punishments for contempts of court shall be restricted to the following cases:

(1) The official misconduct of the officers of such courts respectively.

(1.1) The willful failure of the officers of such courts to disclose a person's complete criminal history record information when requested.

(2) Disobedience or neglect by officers, parties, jurors or witnesses of or to the lawful process of the court.

(3) The misbehavior of any person in the presence of the court, thereby obstructing the administration of justice.

42 Pa. Con. Stat. Ann. § 4132. Over forty years ago, our Supreme Court succinctly explained the differences between the three main subsections of the statute:

Subsection (1) has been held to pertain only to court officials performing ministerial duties, while subsection (2) provides punishment for failure to comply with lawfully issued orders, decrees and process. Subsection (3) applies to conduct, such as that in the instant case, "occurring in or near the courtroom."

*Matter of Campolongo*, 435 A.2d 581, 583 (Pa. 1981) (citing *Commonwealth v. Garrison*, 386 A.2d 971, 978 (Pa. 1978) and *In re Johnson*, 359 A.2d 739, 741 (Pa. 1976)) (footnotes omitted). Thus, the statute defines contempt not by the class of person, but rather the type of conduct. *Garrison*, 386 A.2d at 979 ("No satisfactory definition of contemptuous misconduct has been developed. Perhaps the best definition is that misconduct is behavior that is inappropriate to the role of the actor."). In this instance the Contemnor has accomplished an unprecedented spectacle of behavior that violates all three subsections of the statute. As stated on the record during the proceeding on August 4, 2022, on November 24, 2021, Contemnor refused to enter the courtroom with the dignity of an elected official to politely and intelligently discuss her opposition to the administrative order to transfer responsibility of the juvenile court files. Instead, Contemnor chose to perform the most undignified display of behavior that the undersigned had ever witnessed in

11

over 35 years in the legal system as a prosecutor, private practice attorney, and 17 years as a common pleas judge.[9]

The Contemnor first claims that there can be no contemptible behavior because the Court failed to schedule or notice a proceeding before the Court on November 24, 2021, and that the deputy sheriffs made their own determination of contempt. This claim is without merit. To begin, a formal order is not even necessary for an officer of the court to be punished for the commission of misconduct, let alone a scheduling notice as a condition precedent. *Matter of Johnson*, 359 A.2d 739 (Pa. 1976). In *Matter of Johnson*, the Supreme Court held that

> Subsection I permits the courts of the Commonwealth to compel their officers properly to perform their ministerial duties. For example, sheriffs must serve process, court reporters must record and transcribe testimony and prothonotaries must receive, date and file documents. Misconduct of any of these prescribed duties, which are imposed upon the individual by virtue of the official position held, is made punishable by subsection I. There need by [sic] no formal order directing the individual to do an act nor does the misconduct have to be within the presence of the court. Subsection I authorizes the court to punish the misconduct of any of the day to day functions necessary to the administration of justice.

359 A.2d at 741.[10]

In this matter, it is the ministerial duty of the office of the Clerk of Courts to manage files for the court. In addition, there was a formal order directing the Contemnor to carry out a specific administrative task involving the transfer of juvenile court records, and a clear directive to the Sheriff and his designee(s) of how to proceed if the Contemnor refused to follow the order. The order provided for the Chief Juvenile Probation Officer to take custody of all juvenile court files

---

[9] The court noted that this included his experience presiding over mental health treatment court for 7 years, where participants diagnosed with serious mental illness occasionally break down in open court, but are able to be brought under control within several minutes. Transcript of Hrg., August 4, 2022, at pp. 37-38.

[10] There is no question that a clerk of courts is a ministerial officer in exactly the same vein as a prothonotary. *In re Admin. Order No. 1-MD-2003*, 936 A.2d 1, 9 (Pa. 2007) (holding that the powers of a clerk of courts are "clearly ministerial in nature."); *Miller v. County of Ctr.*, 135 A.3d 233, 238 (Pa. Cmwlth. 2016), *aff'd*, 173 A.3d 1162 (Pa. 2017) (a clerk of courts "serve[s] the courts in an administrative capacity."). Moreover, a clerk of courts possesses no authority to "interpret statutes and to challenge actions of the court that the clerk perceives to be in opposition to a certain law." *In re Admin. Order No. 1-MD-2003*, 936 A.2d at 9.

12

to facilitate their transfer pursuant to the recently promulgated rules of juvenile procedure. In addition, the order required the following of the Contemnor: "The Clerk of Courts, and her staff, shall cooperate in the orderly transfer of files." Administrative Order dated November 23, 2021. Lastly, the order directed the Sheriff to immediately attach and detain the Contemnor – a ministerial officer of the court – pending a contempt proceeding if she refused or failed to comply with the order. The order could not have been clearer that the Contemnor was to cooperate with the transition and not interfere with the orderly transfer of juvenile case filings. Instead, the Contemnor intentionally locked the vault door to obstruct the fulfillment of the court's order and the validly promulgated rules of local procedure that would be effective at the beginning of the next business day. The immediate attachment was necessary and proper to effectuate the business of the court and the administration of justice. The language of the order was more than sufficient to put the Contemnor on notice that engaging in willful defiance would be considered contumacious. *See Himes v. Himes*, 833 A.2d 1124 (Pa. Super. Ct. 2003) (attorney found in contempt for not appearing at a scheduled hearing after being advised to appear or face immediate contempt proceedings).

The Contemnor also claims that because she was able to avoid entering the courtroom and since her contumacious behavior was in the hallway, and not in the presence of the court, the court is powerless to find her in contempt, and therefore, she could not be punished at all. This is a misreading of § 4132 and the relevant case law. As the Supreme Court noted in *Commonwealth v. Falana*, 696 A.2d 126, 128 (Pa. 1997), it is only a conviction pursuant to § 4132(3) that requires misconduct in the presence of the court.[11]

---

[11] It is plainly erroneous to state, as the Contemnor has, that no punishment may be imposed whatsoever, even if assuming, *arguendo*, that the conduct was not in the presence of the court. All of the examples of misconduct under § 4132(1) are of a type that occur outside of a courtroom or the presence of a jurist, or perhaps the judicial facility itself. A judge does not have to actually witness the prothonotary refuse to file an order, or the Sheriff decline to serve

13

A conviction pursuant to section 4132(3) requires proof beyond a reasonable doubt: (1) of misconduct, (2) in the presence of the court, (3) committed with the intent to obstruct the proceedings, (4) which obstructs the administration of justice. *Campolongo*; *Commonwealth v. Martorano*, 387 Pa.Super. 79, 563 A.2d 1193 (1989). To obstruct justice, conduct must significantly disrupt proceedings. *Campolongo*. We noted in *Commonwealth v. Garrison*, 478 Pa. 356, 386 A.2d 971 (1978) (plurality opinion), that contempt requires actual, imminent prejudice to a fair proceeding or **prejudice to the preservation of the court's orderly procedure and authority**.

*Commonwealth v. Falana*, 696 A.2d at 128 (citations omitted) (emphasis added).

In her Concise Statement, the Contemnor attempts to minimize the presence requirement by alleging that she was only "within earshot of the President Judge." At the sentencing proceeding, this Court made, *inter alia*, the following findings:

> On November 24th, obviously, Ms. Davis refused to comply with the order, locked the vault door. The files happened to be contained in the vault in the Clerk of Court's office, and when presented with the [o]rder, she slammed the door shut, and locked the door, spun the dial so that it could not be accessed.
>
> She refused to come [in]to my courtroom when brought up here by the [d]eputies. I was waiting in court for this purpose. I could hear her screaming outside my doorway. She never did come into the courtroom.
>
> ...
>
> [During the proceeding on August 4, 2022, the court played for the record the entirety of courthouse security camera footage, Exhibit M, Surveillance Footage.]
>
> ...
>
> I will note for the record that after refusing to come in the courtroom, Ms. Davis now has her hat and coat on.
>
> The Contemnor absconded from the courthouse quickly thereafter.

Transcript of Hrg., Nov. 24, 2021, at pp. 9-11.[12]

---

process, or watch over the shoulder of a recalcitrant court reporter. Rather, it is an inherent authority that permits the court to enforce the necessary duties attendant to the business of the courts and the administration of justice. To find otherwise would be absurd. Additionally, there was a lawful, written, and filed order that the Contemnor was literally holding in her very hands while she was intentionally violating it.

[12] There was no video footage available of the Contemnor's deliberate act of locking the vault door shut because the Contemnor had personally removed the security camera from her office on October 18, 2021, without the court's permission or the approval of the County Commissioners or the Information Technology department. Transcript of Hrg., August 4, 2022, at pp. 12, 30-32.

RR093

As the proceeding continued, the Contemnor's counsel acknowledged that she refused to come into the courtroom and that the Court heard the commotion, and then conceded that this willful behavior was contumacious:

> MR. DePASQUALE: I understand your position that you were in the courtroom and heard things outside; and also, that the Clerk of Courts refused to enter the Courtroom.
>
> However, I don't believe that constitutes Direct Contempt, Direct Criminal Contempt, any time I've ever heard of it or read of it, is something that actually occurs in the presence of the judge.
>
> We're not arguing about the contempt, because there was an order, and the order was not complied with.

Transcript of Hrg., Nov. 24, 2021, at pp. 13-15. The Contemnor offered nothing in defense of her contumacious behavior, other than to state that she was "assaulted" by the Sheriff's deputies, a claim belied by the surveillance video footage,[13] and to offer an insincere apology. Thus, the Contemnor's argument is based on a tortuous and strained understanding of when behavior is considered to be in the presence of the court.

The courts of our Commonwealth have long recognized a broader definition of what constitutes the "presence" of the court than the Contemnor is willing to accept. "Misconduct occurs in the presence of the court if the court itself witnesses the conduct or if the conduct occurs outside the courtroom but so near thereto that it obstructs the administration of justice." *Falana*, 696 A.2d at 129 (quoting *Garrison, supra*, and citing *United States v. Wilson*, 421 U.S. 309, 315 n. 6 (1975)). In *Falana*, the defendant uttered a threat to the victim upon leaving the courtroom following sentencing. Despite the fact that the trial judge did not hear the threat himself, the Supreme Court affirmed the imposition of direct contempt pursuant to § 4132(3), holding that the

---

[13] The Contemnor's claim of being assaulted is also refuted by the report of the Attorney General's Office, who investigated her allegations after she attempted to file criminal charges against the deputy sheriffs, which reported that the allegations were unfounded. Transcript of Hrg., August 4, 2022, at pp. 23-24, 40.

15

presence of the court factor is satisfied regardless of whether (1) the temporal location is inside or outside of the courtroom; and (2) the judge actually hears the statement. *Id.* Thus, there is no obligation for the court to prove that it actually witnessed the disturbance. *Commonwealth v. Moody*, 125 A.3d 1, 10-11 (Pa. 2015) (citing *Falana, supra*, and *In re Terry*, 128 U. S. 289 (1888)); *see also Commonwealth v. Brown*, 622 A.2d 946 (Pa.Super.1993) (summarizing expansive view of the presence of the court requirement); *In re MacDonald*, 168 A. 521 (Pa.Super.1933) (threat made in rear of courtroom and heard by tipstaff was contumacious). The Supreme Court in *Moody* explicitly rejected the narrow reading of an act being "'in the presence of the court,' with that of it being 'personally observed' by the court." *Moody*, 125 A.3d at 12. Contempt, therefore, can occur not only within direct sight of the Court, but, importantly, within its view when in session: "the court, at least when in session, is present in every part of the place set apart for its own use, and for the use of its officers, jurors, and witnesses: and misbehavior anywhere in such place is misbehavior in the presence of the court." *Id., quoting Ex parte Savin*, 131 U. S. 267, 277 (1889).

Instantly, there is no question that the court heard the misconduct that disrupted the administration of justice. The scene of the Contemnor's willful disobedience reverberated throughout the courthouse and gathered a multitude of onlookers. The court received a telephone call from an eyewitness to the disturbance who described the Contemnor's struggle with the deputy sheriffs. Perhaps most importantly, the court sat ready at the bench to initiate the contempt proceeding while listening to the commotion of the Contemnor's misconduct right outside the courtroom doors, *i.e.*, the Contemnor's refusal to answer for her intentional defiance of the court's order to facilitate the transfer of the juvenile cases. Upon retiring to chambers to consult with the Sheriff and other officers of the court, the court's law clerk reported that the Contemnor flatly declined the direction to enter the courtroom. Unquestionably, the Contemnor committed

16

RR095

misconduct in the presence of the court, thereby satisfying the dictates of the case law in *Moody* and *Falana, supra*.

Moreover, all of the behavior of the Contemnor occurred in the courthouse. The office of the Clerk of Courts is bookended on both sides by judicial chambers and courtrooms. The Contemnor's dramatic behavior and resistance to the commands of the court, its staff, and Sheriff's deputies occurred in the elevator and hallways of over three floors of the courthouse, including those adjacent to the undersigned's courtroom. She stood directly outside the courtroom and emphatically refused to enter it. As the Supreme Court in *Moody* noted, the court includes "every part of the place set apart for its own use, *and for the use of its officers* . . . and misbehavior anywhere in such place is misbehavior in the presence of the court." *Moody*, 125 A.3d at 12 (emphasis added). The Constitution and Judicial Code are abundantly clear that the clerk of courts is a ministerial officer of the court; thus, her actions in and near the courtroom(s), adjacent hallways, and the clerk's office in the courthouse are within the presence of the Court.

Furthermore, the Contemnor obstructed the administration of justice in front of Sheriff's deputies, the Chief Juvenile Probation Officer, and the District Court Administrator, all of whom were either serving and/or executing the order – directed to an inferior officer of the court and in the courthouse – on behalf of the court as its agents, and, therefore, the conduct was clearly in the presence of the court. *In re Order for Destruction of Gambling Devices*, 32 Berks 193 (C.P. Berks 1940), *rev'd on other grounds, Appeal of Marks*, 20 A.2d 242 (Pa.Super.1941); *but cf. Altemose Const. Co. v. Building and Const. Trades Council of Philadelphia*, 296 A.2d 504 (Pa. 1972), *cert. denied*, 411 U.S. 932 (1973). It has also been held that a failure to follow the instructions of the Sheriff's deputies or court attendants in court is contumacious behavior. *See Commonwealth v.*

17

*Patterson*, 308 A.2d 90 (Pa. 1973) (defendants held in contempt after engaging in violent altercation with deputies and court attendants while attempting to leave courtroom).

Lastly on this issue, the record establishes that the undersigned was ready and awaiting the Contemnor in the courtroom. The Supreme Court has defined an "'open court' as one 'which has been formally convened and declared open for transactions of its proper judicial business.'" *Commonwealth v. Ferrara*, 409 A.2d 407, 411 (Pa. 1979) (citing Black's Law Dictionary (1968); *Brown*, 622 A.2d at 948-949. In this instance, the Contemnor was personally served the order, which advised that she would be attached and detained for immediate contempt proceedings *if* she failed to cooperate in the transfer of the juvenile cases. The Contemnor refused to even read the order, let alone follow the order, and instead chose to actively obstruct the process in contravention of the order. Once detained by the Sheriff's deputies (after physically struggling with them), she deliberately refused to enter the courtroom as commanded for contempt proceedings. An individual acts in disobedience or neglect of the lawful process of the court when not appearing in court; this act "is no less contemptuous than the conduct of a witness who appears but refuses to testify and is deserving of no lesser punishment." *Ferrara*, 409 A.2d at 411; *see also Commonwealth v. Marcone*, 410 A.2d 759 (Pa. 1980) (affirming finding of direct criminal contempt against attorney who failed to appear for call of the trial list). In other words, failure to appear in open court can be contemptuous conduct punishable by a term of imprisonment.[14] The court was in session and the Contemnor consciously and defiantly refused to appear before the undersigned despite being ordered to do so. In addition, the Contemnor, an officer of the court,

---

[14] In *Ferrara*, the husband and wife defendants were required to appear in court as a condition of their bails. They failed to appear on the dates for arraignment and trial and were sentenced to four months and two months of imprisonment, respectively.

18

willfully obstructed the carrying out of an order transferring the custody of juvenile court files. Such actions constitute direct criminal contempt.

The Contemnor's second and third alleged errors challenge the sentence imposed by the court. Specifically, she asserts that her sentence is illegal pursuant to § 4133 of the Judicial Code. The statute states, in its entirety:

> Except as otherwise provided by statute, the punishment of commitment for contempt provided in section 4132 (relating to attachment and summary punishment for contempts) shall extend only to contempts committed in open court. All other contempts shall be punished by fine only.

42 Pa. Con. Stat. Ann. § 4133.

By its very language, § 4133 permits a court to sentence a contemnor to a term of imprisonment for direct contempt pursuant to § 4132(3), *i.e.*, in the presence of the court. *See, e.g., Moody*, 125 A.3d 1; *Brown*, 622 A.2d 946; *Ferrara*, 409 A.2d 407; *Patterson*, 308 A.2d 90. As detailed above, the Contemnor engaged in willful, deliberate acts of contempt in the presence of the court; therefore, a term of imprisonment is plainly permissible under the language of the statute. The only limitation on the term of imprisonment is if said term lasted beyond six months, then the right to a jury trial would attach. *Commonwealth v. Mayberry*, 327 A.2d 86 (Pa. 1974); *accord In re Arrington*, 214 A.3d 703, 709 (Pa.Super.2019) (maximum sentence for criminal contempt may not exceed six months).[15] A flat sentence, *i.e.*, one lacking a minimum and maximum would also violate the Sentencing Code, but that is inapplicable in the instant matter.

---

[15] There is a dearth of case law addressing the grading of a criminal contempt offense, which is not included within the Criminal Code but is instead an inherent judicial authority addressed in the Judicial Code. That said, criminal contempt, direct or indirect, is punishable by up to six months of imprisonment; therefore, it cannot be a summary offense because such offenses are limited to a maximum of ninety days' imprisonment if following the definitions within the Crimes Code. 18 Pa. Con. Stat. Ann. § 106; *cf. Commonwealth v. Clark*, 472 A.2d 617, 618-619 (Pa. Super. Ct. 1984) (direct criminal contempt is neither a felony nor a misdemeanor for purpose of Rule 1100 (now Rule 600) of the Rules of Criminal Procedure). In any event, the grading is immaterial to the fact that the Contemnor's sentence of imprisonment is within the allowable confines acknowledged in our Commonwealth's case law.

19

*Commonwealth v. Cain*, 637 A.2d 656 (Pa.Super.1994); *Commonwealth v. Moody*, 46 A.3d 765, 770 n. 4 (Pa. Super.2012), *rev'd on other grounds*, *Commonwealth v. Moody*, 125 A.3d 1 (Pa. 2015); 42 Pa. Con. Stat. Ann. § 9756(a)-(b).

Moreover, § 4133 is an unconstitutional infringement of the Court's inherent authority to set forth the punishment for direct criminal contempt. *Commonwealth v. McMullen*, 961 A.2d 842 (Pa. 2008) (declaring the limitation on the punishment for indirect criminal contempt pursuant to 42 Pa. Con. Stat. Ann. § 4136(b) as unconstitutional); *see also*, 18 Pa. Con. Stat. Ann. § 107(b) and (c) (abolishing common law crimes but not affecting the power of a court to punish for contempt).[16] Our Supreme Court has long recognized that the power to impose punishment for criminal contempt is not derived from legislation, but "is a right inherent in courts and is incidental to the grant of judicial power under Article 5 of our Constitution." *Marcone*, 410 A.2d at 763.

In *McMullen*, the Supreme Court declared 42 Pa. Con. Stat. Ann. § 4136, which specified the punishment a court could impose for indirect criminal contempt, to be unconstitutional. *McMullen*, 961 A.2d at 848. Section 4136(b) had purported to limit a court's authority to punish for indirect criminal contempt to a maximum fine of $100.00 and 15 days' imprisonment. 42 Pa. Con. Stat. Ann. § 4136(b). The Supreme Court explained the following:

> Initially, we note § 4136(b) is not in the Crimes Code, but under Title 42–Judiciary and Judicial Procedure, Chapter 41–Administration of Justice, Sub–Chapter C.-Contempt of Court. We are thus left with a legislative creation of indirect criminal contempt under § 4136. Since courts have the authority to punish individuals in violation of their orders under the case law described above and § 107(c), the legislature cannot create a form of indirect criminal contempt and restrict a court's ability to punish individuals who commit contempt of court. While the legislature generally may determine the appropriate punishment for criminal conduct, indirect criminal contempt is an offense against the court's inherent authority, not necessarily against the public. Section 4136(b) provides maximum penalties the court may impose; thus, § 4136(b) unconstitutionally restricts the court's ability to punish for contempt.

---

[16] Issues related to the legality of a sentence are reviewed *de novo*, and the scope of review is plenary. *Commonwealth v. McKown*, 79 A.3d 678, 691 (Pa. Super. Ct. 2013).

20

*McMullen*, 961 A.2d at 849-850.

Turning to § 4133, the court is aware that the Supreme Court declined to explicitly address the "other statutory law concerning contempt" in *McMullen*. *Id.* at 850, n. 6. However, § 4133 is virtually indistinguishable from the subsections of § 4136 that the *McMullen* decision declared unconstitutional. Applying the same framework as the Supreme Court in *McMullen*, there is little doubt that § 4133 is also an impermissible intrusion on the inherent authority of the courts of our Commonwealth to punish individuals who commit direct contempt of court. This is the result urged by Chief Justice Castille in *McMullen*:

> In my view, the General Assembly cannot dictate to the courts what is adequate punishment to vindicate a court's authority. Indeed, to concede such a power would be to allow the General Assembly, in theory, to destroy the judiciary's ability to address contempt: for what would there be to prevent the General Assembly from limiting punishment to something completely toothless such as, for instance, a five dollar fine?

*Id.* at 854 (Castille, C.J., concurring). A similar note was struck in Justice Greenspan's concurrence too. *Id.* at 855, n. 2 (Greenspan, J., concurring) ("One could argue that Section 4133 likewise constitutes an infringement on a court's authority to enforce its own orders. However, that statute is not before us in this case."). Other courts and commentators have reached the same, inevitable conclusion that the legislature has encroached too far with § 4133. *See, e.g.*, *Commonwealth v. Leomporra*, 2020 WL 6821633 (Pa.Super.2020); *Commonwealth v. Allen*, 2015 WL 6957090 (Pa.Super.2015); *Commonwealth v. Leonard*, 2014 WL 10979687 (Pa.Super.2014); *Commonwealth v. Morgret*, Nos. SA-53-2014 and SA-63-2014 (C.P. Lycoming February 25, 2015); *Commonwealth v. Phillips*, 2014 WL 8105545 (C.P. Phil. July 29, 2014); Daniel P. Sodroski, *Unraveling the Uncertainties of the Separation of Powers between Pennsylvania's General Assembly and the Judiciary in the Field of Criminal Contempt: The Constitutionality of Pennsylvania's Criminal Contempt Statutes after Commonwealth v. McMullen*, 53 DUQUESNE

21

LAW REVIEW, 567, 605 (2015) (analyzing history of contempt and separation of powers and concluding that § 4133 is likely unconstitutional because it limits the power of the court to set an appropriate penalty for contempt); *accord, In re Thirty-Fifth Statewide Investigating Grand Jury*, 112 A.3d 624, 630-631 (Pa. 2015) ("Regarding separation-of-powers concern, this Court has strongly defended the independent role of the judiciary in vindicating the authority ascribed to it by the Constitution, particularly as relates to conduct which is contemptuous of a court") (citing *McMullen, supra*). Accordingly, the sentence of the Contemnor is permissible and an appropriate punishment for her outrageous behavior and direct criminal contempt of the court's authority.

## Conclusion

The Judicial Code provides that every court, including the court of common pleas, "shall have the power to make such rules and orders of court as the interest of justice or the business of the court may require" unless otherwise proscribed by general rule. 42 Pa. Con. Stat. Ann. § 323. The president judge of a court of common pleas is vested with the authority to

> Be the executive and administrative head of the court, supervise the judicial business of the court, promulgate all administrative rules and regulations, make all judicial assignments, and assign and reassign among the personnel of the court available chambers and other physical facilities.

42 Pa. Con. Stat. Ann. § 325(e)(1). On the other hand, the clerk of courts is an inferior officer of the court who wields powers that are "strictly administrative" and "purely ministerial in nature." *Commonwealth v. Williams*, 106 A.2d 583, 588-589 (Pa. 2014) (citing *In re Administrative Order No. 1-MD-2003*, 936 A.2d 1, 9 (Pa. 2007)). While the functions of the clerk of courts are vitally important to the business of the courts and, in this County at least, carried out by an elected official, her authority is limited by either statute or rule of court. *In re Administrative Order No. 1-MD-2003*, 936 A.2d at 9. It is beyond peradventure that the clerk has "no judicial powers" and lacks

22

the "discretion to interpret statutes." *Id.* Our Supreme Court has unambiguously held that: (1) a clerk cannot "challenge actions of the court that the clerk perceives to be in opposition to a certain law"; and (2) "it is not the function of the clerk of courts to interpret the administrative orders of the court of common pleas to determine whether they comply with the law." *Id.* It is with this backdrop that the court notes the familiar refrain that in the context of contempt, "[m]isconduct is behavior that is inappropriate to the role of the actor." *See, e.g., In re Arrington, supra; Falana, supra.*

As the court found and as detailed above in the discussion:

1. The Contemnor sought to waive a multitude of the duties of her office, including the administration of the juvenile court records which were the subject of the order in question. Attempts at resolving the Contemnor's "waiver of duties" were unsuccessful.

2. The court promulgated two approved local rules of juvenile procedure, the effect of each was to transfer the duties of the clerk of court for juvenile records and filings to the Juvenile Probation Office.

3. The Contemnor manifested in writing her intent to obstruct the facilitation of the local juvenile rules, and substituted her own misguided interpretations of the law.

4. The court issued multiple administrative orders regarding the transfer of the juvenile records, including the order dated November 23, 2021, requiring the Contemnor – an officer of the court – to cooperate.

5. Demonstrating her willful disobedience, the Contemnor refused to read or acknowledge the administrative order and locked the door to the vault of her office in an attempt to obstruct the court's access to the juvenile court files and to obstruct the business of the court and defy a judicial directive.

23

6. The Contemnor struggled and actively resisted the attempts of the deputy sheriffs to detain and attach her and bring her before the court.

7. The Contemnor verbally and through her physical actions refused to enter the courtroom of the undersigned for contempt proceedings. Then, after receiving medical attention, she willingly absconded from the courthouse to avoid the consequences of her actions.

8. A series of appellate actions initiated by Contemnor (all of which were quashed, denied, or dismissed, but which required the court's response, significant time, and attention), led to a series of delays.

9. The Contemnor never sincerely acknowledged, explained or apologized for her contumacious behavior. In fact (and as captured in the transcript), her attorney had to urge her to provide some type of apology at sentencing.

10. The transfer of the juvenile court records was completed without any cooperation or participation from the Contemnor.

This case represents the breakdown of an orderly system of justice. It answers the question of what would happen if an official were to ignore the law, or worse, sabotage the functions of a branch of government. The Contemnor is the clerk of courts for the 27th Judicial District. Her job is to follow the rules and orders of the court. She chose not to do so in dramatic fashion. The lower court submits that the members of the Superior Court review the courthouse security footage, Exhibit M, in its entirety. The security video clearly depicts the Contemnor carrying on and resisting the commands of the Sheriff's deputies. The video clearly depicts the outrageous spectacle she caused, sliding down the wall in the hallway after faking an injury from a deputy sheriff putting his hand on her arm. The Contemnor is then seen laying on the floor and rolling around on the ground, all while contorting herself to take "selfies" and videos with her cell phone.

Members of the public and other court personnel are seen walking by and stepping over her during her tantrum. And then, finally, the Contemnor is shown getting up unassisted and walking out of the courthouse. As stated, this was the most undignified and disgraceful display of behavior in the courthouse that the court has witnessed throughout his career. The Contemnor's behavior was an affront to the court's orderly procedure and authority, and to the structure and powers of the unified judicial system. The Contemnor's alleged errors essentially boil down to one argument, that the imposition of the term of incarceration is an inappropriate sanction for her acknowledged and undisputed contumacious behavior. However, the sanction was tailored to fit the conduct the Contemnor exhibited. The Contemnor fails to demonstrate that both the finding of and sentence imposed for contempt was unlawful or was otherwise inappropriate for the outrageous misbehavior of someone in her position.

Accordingly, for the foregoing reasons, the lower court submits that the finding of contempt and judgment of sentence against the Contemnor, Brenda Davis, should be affirmed and the appeal dismissed.

By the Court:

Date: 4/6/2023

John F. DiSalle, P.J.

25